HAGENS BERMAN SOBOL SHAPIRO LLP
Lucas E. Gilmore (CA Bar No. 250893)
lucasg@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Phone: 510-725-3000

DEMOCRACY FORWARD FOUNDATION
Andrea J. Matthews* (MA Bar No. 694538)
amatthews@democracyforward.org
Jennifer Fountain Connolly* (DC Bar No. 1019148)
jconnolly@democracyforward.org
Adnan Perwez* (DC Bar No. 27532)
aperwez@democracyforward.org
Bradley Girard* (DC Bar No. 1033743)
bgirard@democracyforward.org
Ross Snyder* (DC Bar No. 90037922)
rsnyder@democracyforward.org
Robin F. Thurston* (DC Bar No. 1531399)
rthurston@democracyforward.org
P.O. Box 34553
Washington, D.C. 20043
Phone: 202-448-9090
Fax: 202-921-4875

* *pro hac vice forthcoming*

# UNITED STATES DISTRICT COURT FOR

# THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Electronic Privacy Information Center**, **Nicole Cleland**, **Jacquelyn Ivey**, and **Anna Walker**, <br><br> Plaintiffs <br> v. | Case No.: **'26 CV 4232 AJB MSB** <br><br> **COMPLAINT** |

**Markwayne Mullin**, in his official capacity as Secretary of the Department of Homeland Security,

**U.S. Department of Homeland Security**,

**David J. Venturella**, in his official capacity as Senior Official performing the duties of the Immigration and Customs Enforcement Director,

**U.S. Immigration and Customs Enforcement**,

**Rodney S. Scott**, in his official capacity as the Commissioner of Customs and Border Patrol,

and

**U.S. Customs and Border Patrol**,

          Defendants.

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................... 1

II.   PARTIES ................................................................................. 4

III.  JURISDICTION ..................................................................... 5

IV.   VENUE ................................................................................... 5

V.    LEGAL BACKGROUND ....................................................... 5

    A.    The Privacy Act ............................................................. 5

        1.    Statutory Definitions ........................................... 7

        2.    The Act's Requirements for Agencies ................ 7

VI.   FACTUAL ALLEGATIONS ................................................... 9

    A.    The Trump-Vance Administration's Deportation Campaign ....................................................................... 9

    B.    The Department of Homeland Security's Automated Targeting System ........................................................ 11

        1.    ATS's Facial Recognition Capability ............... 12

        2.    ATS's System of Records Notice ....................... 14

        3.    ATS's Use in Customs and Border Protection's Trusted Traveler Programs ................................ 16

    C.    The Government's Rescission of Policies Constraining Protester Surveillance ................................................ 17

        1.    The 2023 Facial Recognition Directive ............ 18

        2.    The 2016 Mobile Application Privacy Policy ... 19

    D.    DHS's New Policy of Collecting Legal Observer and Protester Information .................................................... 20

        1.    The Government's Surveillance of Nicole Cleland ... 27

COMPLAINT                                                     Case No.

       2.     The Government's Surveillance of Jacquelyn Ivey .................28

       3.     The Government's Surveillance of Anna Walker ...................31

    E.    Injuries to Plaintiffs..................................................................33

       1.     Injuries Resulting from DHS's Rescission of Its Prior Policies...........................................................................33

       2.     Injuries Resulting from the Creation and Maintenance of Plaintiffs' Records .........................................34

       3.     Injuries Resulting from the Revocation of Trusted Traveler Status ........................................................................36

       4.     Injuries Resulting from Trusted Traveler Status Not Being Reinstated.......................................................................37

       5.     EPIC's Injuries...............................................................38

VII.   CLAIMS FOR RELIEF................................................................41

COUNT I VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A) ...........................................................41

COUNT II VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A) ...........................................................42

COUNT III VIOLATION OF APA, 5 U.S.C. § 706(2)(A) ....................................43

COUNT IV VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,  5 U.S.C. § 706(2)(D).................................................44

COUNT V VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(1).................................................................45

COUNT VI VIOLATION OF APA, 5 U.S.C. § 706(2)(A) ...................................46

COUNT VII VIOLATION OF NON-DISCRETIONARY OFFICIAL DUTIES, 28 U.S.C. § 1361 ...................................................47

COUNT VIII VIOLATION OF THE FIRST AMENDMENT ...........................48

PRAYER FOR RELIEF ................................................................49

## I.    INTRODUCTION

1.    When the Department of Homeland Security dramatically ratcheted up its immigration enforcement, people across the country—of all ages and backgrounds—did what anyone is supposed to do when they disagree with government action: They exercised their First Amendment rights. They peacefully protested. And, as matters here, they observed and recorded how law enforcement agents acted in public.

2.    In response, DHS decided to record the Americans who were peacefully observing its agents, adopting a secret Protester Surveillance Policy enabling its agents to first collect records on Americans engaging in First Amendment exercise and then maintain them in DHS systems, where they can be used to retaliate against those Americans. Beginning sometime in 2025, DHS deployed a dragnet of drones, body cams, face-scanning apps, license-plate scanners, and camera phones to, as one memo instructed, "capture all images, license plates, identifications, and general information on hotels, agitators, protestors, etc., so we can capture it all in one consolidated form."[1]

3.    DHS agents have not been shy about gathering this information or its purpose. In Maine, DHS agents told multiple observers that they were being added to a database of "domestic terrorists."[2] In Chicago, agents routinely used facial-recognition scans on members of the public.[3] In Minneapolis, observers simply

---

[1] Jeff Winter, Priscilla Alvarez, *Alex Pretti broke rib in confrontation with federal agents a week before death, sources say*, CNN (Jan. 27, 2026), https://perma.cc/CK27-7S7W.

[2] Jude Joffe-Block, *A new lawsuit alleges DHS illegally tracked and intimidated observers*, NPR (Feb. 23, 2026), https://perma.cc/AB7M-AS6E (quoting Compl., *Hilton v. Mullin*, No. 2:26-cv-00092 (D. Me. Feb. 23, 2026), Dkt. No. 1).

[3] Joseph Cox & Ashley Cleek, *How a US Citizen Was Scanned With ICE's Facial Recognition Tech*, Reveal News (Dec. 13, 2025), https://perma.cc/6N3U-YBPP; Kevin Collier et al., *How ICE agents are using facial recognition technology to bring*

COMPLAINT                                                                Case No.

watching agents on public streets have been led by those agents to their own houses, despite never having interacted with an agent[4]—a practice so common that it has been named "being driven home by ICE." And across the country, DHS agents have approached observers and addressed them by their full names, even though those observers never identified themselves to the agents or showed them any form of identification.

4.    As a result of its Protester Surveillance Policy, DHS has recorded and retaliated against each Individual Plaintiff. All three engaged in peaceful legal observation of DHS agents. And when they did, DHS agents recorded those activities. After stopping his car in a residential street and getting out to approach her, a Border Patrol agent told Plaintiff Nicole Cleland that he had "facial recognition" and that his "body cam" was working. Multiple federal immigration agents surrounded Plaintiff Jacquelyn Ivey's car as she peacefully recorded them in a parking lot, took pictures of her license plate, put a phone camera in her face, and demanded her ID before they would allow her to leave. Three federal immigration agents stopped Plaintiff Anna Walker in a Target parking lot while one pointed a phone camera at her face and another took a picture of her license plate.

5.    It's bad enough that DHS publicly collected information on Americans engaged in lawful First Amendment exercise. But worse, DHS also decided to maintain the information in one or more of its systems, enabling it to later retaliate against observers and protestors—including by cancelling Trusted Traveler status (which includes TSA Precheck and Global Entry),[5] a process that is implemented

_surveillance to the streets_, NBC News (Feb. 6, 2026), https://perma.cc/6UWZ-74UT.

[4] Jonah E. Bromwich, _ICE Agents Menaced Minnesota Protesters at Their Homes, Filings Say_, N.Y. Times (Feb. 14, 2026), https://perma.cc/3XMZ-P2AU.

[5] Dave Jamieson, _Watching ICE Agents? You Could Lose Your Global Entry_, HuffPost (Mar. 4, 2026), https://perma.cc/AH52-H292; Dave Jamieson, _Minnesota_

COMPLAINT                                              Case No.

through the continuous monitoring of information on participants through DHS's omnibus system of records, the Automated Targeting System.

6.    Federal law prohibits each one of these actions. Under the Privacy Act, 5 U.S.C. § 552(a), federal agencies are flatly forbidden from collecting personally identifying information on people for simply exercising their First Amendment rights. The Privacy Act also forbids an agency from maintaining personally identifying records unless it is "relevant and necessary to accomplish" a required agency purpose. And even if DHS had some legitimate purpose in collecting the information, the Privacy Act requires it to publicly justify and explain that collection, and give the public a chance to comment on its new direction. Finally, the First Amendment prohibits the government from retaliating against Americans for engaging in a constitutionally protected activity.

7.    Instead of adhering to these requirements, DHS secretly adopted its Protester Surveillance Policy and never publicly explained how and why it has decided it can collect such information—including under what authority it is being collected, how it is being stored, for how long, what DHS is using the information for, and why the information is necessary to accomplish a required agency purpose (or what that purpose even could be).

8.    Because DHS's secret policy of collecting, maintaining, and using personally identifying information of protestors and observers violates the Privacy Act and is arbitrary and capricious, and because under its policy DHS has retaliated against Individual Plaintiffs in violation of the First Amendment, this Court should declare DHS's Protester Surveillance Policy illegal, vacate it, and enjoin DHS from acting in accordance with it.

---

*Man Loses Global Entry After Watching Immigration Agents*, HuffPost (May 4, 2026), https://perma.cc/C6KY-8XV8.

COMPLAINT                                                                    Case No.

## II.    PARTIES

9.    Plaintiff Electronic Privacy Information Center (EPIC) is a 501(c)(3) nonprofit organization headquartered in Washington, D.C. and established in 1994 to focus public attention on emerging privacy and civil liberties issues. Central to EPIC's mission is oversight and analysis of government activities that impact individual privacy, along with public education and engagement in order to help people better protect their privacy from government overreach. EPIC is a membership organization. An individual member of EPIC is any person who contributes to the advancement of EPIC's mission, who acts in accordance with the core values and policies of EPIC, and who has been recognized and registered as a member by EPIC, by virtue of payment of annual dues or having been granted a dues waiver. This includes members of EPIC's Advisory Board, who are distinguished experts in law, technology, and public policy.

10.    Plaintiff Nicole Cleland is a United States citizen residing in Minnesota and an "individual" within the meaning of the Privacy Act, 5 U.S.C. § 552a(a)(2).

11.    Plaintiff Jacquelyn Ivey is a United States citizen residing in South Carolina and an "individual" within the meaning of the Privacy Act, 5 U.S.C. § 552a(a)(2).

12.    Plaintiff Anna Walker is a United States citizen residing in California and an "individual" within the meaning of the Privacy Act, 5 U.S.C. § 552a(a)(2).[6]

13.    Defendant DHS is an agency within the meaning of the Privacy Act, 5 U.S.C. § 552a(a)(1), and the APA, 5 U.S.C. § 551(a), which is headquartered in Washington, D.C.

14.    Defendant Markwayne Mullin is the Secretary of DHS and is sued in his official capacity.

---

[6] Together, Plaintiffs Cleland, Ivey, and Walker are Individual Plaintiffs.

- 4 -

COMPLAINT                                                                      Case No.

15. Defendants United States Immigration and Customs Enforcement and Customs and Border Protection are components of DHS and agencies within the meaning of the Privacy Act, 5 U.S.C. § 552a(a)(1), and the APA, 5 U.S.C. § 551(1), and are headquartered in Washington, D.C.

16. Defendant David J. Venturella is the Senior Official performing the duties of the ICE Director and Defendant Rodney S. Scott is the Commissioner of CBP. Each is sued in his official capacity.

## III.    JURISDICTION

17. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. This action arises under the U.S. Constitution and the APA, 5 U.S.C. §§ 551 *et seq.* An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

## IV.    VENUE

18. Venue is proper under 28 U.S.C. § 1391(e)(1) because this action seeks relief against a federal agency and officials acting in their official capacity.

## V.    LEGAL BACKGROUND

### A.    The Privacy Act

19. Following the federal government's targeting of Americans it deemed "subversive" during the Watergate and Counterintelligence Program (COINTELPRO) scandals, and after a decade of public debate over the risks of establishing a centralized national data bank, Congress adopted the Privacy Act to restore trust in the government's obligation to respect Americans' right to privacy.[7]

---

[7] Rebecca S. Kraus, U.S. Census Bureau, Statistical Déjà Vu: The National Data Center Proposal of 1965 and Its Descendants (2011), https://perma.cc/SWE9-G4T4.

- 5 -

COMPLAINT                                                                    Case No.

As the Act's primary sponsor explained, that "fundamental" civil liberty "is designed to assure that the minds and hearts of Americans remain free."[8]

20.    The Privacy Act is predicated on the understanding that "[e]ach time we give up a bit of information about ourselves to the Government, we give up some of our freedom."[9] As a result, Congress concluded that "there must be limits upon what the Government can know about each of its citizens."[10] So the Privacy Act sought to prevent the government from creating "data banks and new personal information systems without statutory authorization from Congress and without proper regard for privacy of the individual, confidentiality of data, and security of the system."[11]

21.    The Act accomplished this objective by imposing several checks on the government's ability to compile and maintain records on individual people. Some checks are procedural, including requirements that the government publish certain information about the systems of records it maintains. Other checks impose substantive limits, including prohibiting the government from collecting records describing how a person exercises their First Amendment rights.

22.    Together, the Privacy Act's requirements establish "certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies" to "collect, maintain, use or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose," and ensuring "that adequate safeguards are provided to prevent misuses of such information." Privacy Act of 1974, Pub. L. No. 93-579, §§ 2(b), 2(b)(4), 88 Stat. 1896 (1974), *codified at* 5 U.S.C. § 552a note.

---

[8] Staff of S. Comm. on Gov't. Operations & H. Comm. on Gov't. Operations, 94th Cong., Legislative History of the Privacy Act of 1974, S. 3418 (Public Law 93-579), at 3 (Comm. Print 1976), [hereinafter Source Book], https://perma.cc/ZC5M-XA6Z.

[9] *Id.* at 4.

[10] *Id.*

[11] *Id.* at 217.

COMPLAINT                                                    Case No.

**1.      Statutory Definitions**

23.     First, the Act applies to a government "system of records," which is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular." 5 U.S.C. § 552a(a)(5). Other identifiers include "a finger or voice print or a photograph." *Id.* § 552a(a)(4).

24.     The Act defines "record" broadly—"any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph." *Id.*

25.     Likewise, the Act defines "maintain" broadly; it "includes maintain, collect, use, or disseminate." *Id.* § 552a(a)(3).

**2.      The Act's Requirements for Agencies**

26.     Subsection (e) of the Act outlines the requirements for "[e]ach agency that maintains a system of records." *Id.* § 552a(e).

27.     First, the Act bars agencies from maintaining records about individual people unless that information is "relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President." *Id.* § 552a(e)(1).

28.     Next, the Act imposes public disclosure requirements on agencies that seek to collect individuals' information: When an agency creates or revises a system of records containing information about individual people, the agency must publish a notice in the Federal Register containing key information about the system. *See id.* § 552a(e)(4). That information includes:

a.      the system's "name and location," *id.* § 552a(e)(4)(A);

COMPLAINT                                                                 Case No.

b.    the "categories of individuals on whom records are maintained," *id.* § 552a(e)(4)(B);

c.    the "categories of records," *id.* § 552a(e)(4)(C);

d.    "each routine use of the records . . . including the categories of users and the purpose," *id.* § 552a(e)(4)(D);

e.    the agency's policies and practices "regarding storage, retrievability, access controls, retention, and disposal of the records," *id.* § 552a(e)(4)(E).

f.    This disclosure is commonly called a "system of records notice" or "SORN."

29.    And when an agency intends to use a system of records's information in a new way or change the scope of the records the system maintains, it must provide a minimum of 30-days notice in the Federal Register, along with an opportunity for the public to submit "written data, views, or arguments to the agency[.]" *Id.* § 552a(e)(11).

30.    Finally, in recognition of the First Amendment's paramount importance to Americans' civil liberties, the Act provides that agencies shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless[,]" among other things, such maintenance is "pertinent to and within the scope of an authorized law enforcement activity." *Id.* § 552a(e)(7).

31.    The First Amendment provision "establishes an even more rigorous standard" for records than the Act's general prohibition against collecting records unless "relevant and necessary to accomplish" a statutory purpose.[12] It applies to records regarding "political beliefs, freedom of speech and of the press, and freedom

---

[12] *Privacy Act Guidelines—July 1, 1975, Implementation of Section 552a of Title 5 of the United States Code*, 40 Fed. Reg. 28,949, 28,965 (July 9, 2025), *reprinted in* Source Book at 1073.

- 8 -

of assembly and petition."[13] And to avoid any doubt, Congress admonished agencies "determining whether or not a particular activity constitutes the exercise of a right 'guaranteed by the First Amendment'" to "apply the broadest reasonable interpretation."[14]

32.    The Act's prohibition on maintaining records describing individuals' First Amendment activities contains an exception for records "pertinent to and within the scope of an authorized law enforcement activity[.]" 5 U.S.C. § 552a(e)(7). Nonetheless, Congress intended that even under the exception, "no file would be kept of persons who were merely exercising their constitutional rights[.]"[15]

## VI.    FACTUAL ALLEGATIONS

### A.    The Trump-Vance Administration's Deportation Campaign

33.    Since its first days in office, the Trump-Vance Administration has waged a sprawling campaign to deport migrants in the United States. The Administration has sought to reduce immigration levels by any means necessary, launching what it refers to as "the most aggressive and successful immigration enforcement overhaul in modern history."[16]

34.    This unprecedented effort includes the mass deployment of ICE and CBP agents to major cities to detain and often deport significant numbers of

---

[13] *Id.*

[14] *Id.*; 120 Cong. Rec. at 40,406 (1974), *reprinted in* Source Book at 988 ("[T]he compromise [of the Senate and House bills] broadens the House provisions application to all First Amendment rights").

[15] 40 Fed. Reg. at 28,965, *reprinted in* Source Book at 903.

[16] *Era of Amnesty is Over: President Trump Restores Rule of Law to Immigration Courts*, The White House (Apr. 9, 2026), https://perma.cc/AH4W-SHFX.

- 9 -

immigrants,[17] many of whom are children or have resided in the United States for decades.[18]

35.    The Trump-Vance Administration has also been quick to assert that Americans it believes stand in the way of its deportation campaign are "domestic terrorists." Within hours of federal agents shooting and killing legal observer Alex Pretti, the Homeland Security Secretary and White House Deputy Chief of Staff described him as a domestic terrorist[19] and DHS asserted that he intended to "massacre law enforcement."[20] After legal observer Renee Good was shot and killed by a federal agent, Vice President JD Vance asserted that Good was "obstructing a lawful enforcement operation" and that Good's death "falls on [Good] and all of the radicals who teach people that immigration is the one type of law that rioters are allowed to interfere with."[21]

36.    The Administration has also enhanced the government's surveillance capacity to facilitate its deportation campaign. DHS has entered into and increased

[17] *See* Raj Saha et al., *Inside the Deportation Machine*, N.Y. Times (Dec. 22, 2025), https://www.nytimes.com/interactive/2025/12/22/us/trump-immigration-deportation-network-ice-arrests.html.

[18] *Id.* (reporting that over 4,000 children have been deported under the Trump Administration's immigration enforcement surge).

[19] Stephen Miller (@StephenM), X (Jan. 24, 2026), https://perma.cc/AM3C-KYTU; Associated Press, *Kristi Noem holds a press conference* (YouTube, Jan. 24, 2026, 7:22 PM ET), https://www.youtube.com/watch?v=7XzBLH68neE; *see also* Dinah Voyles Pulver, *Timeline of Trump officials' changing comments on Alex Pretti shooting*, USA Today (Jan. 30, 2026), https://perma.cc/XD3F-6LZ5.

[20] Homeland Security (@DHSgov), X (Jan. 24, 2026, 6:31 PM ET), https://perma.cc/56SW-YW3Z.

[21] JD Vance (@JDVance), X (Jan. 8, 2026, 2:27 PM ET), https://perma.cc/9T3M-EFUU; John Grosso, *Catholic Vice President Vance takes to social media to justify killing of Renee Good*, Nat'l Cath. Rep. Online (Jan. 8, 2026), https://perma.cc/5WQ5-PWHT.

COMPLAINT                                                                    Case No.

funding for contracts to scrape social media content[22] and buy data from third-party brokers[23]—tools that allow the government to track the speech and movements of any person in the country, regardless of immigration status.

**B.      The Department of Homeland Security's Automated Targeting System**

37.    The Administration's enhanced surveillance tools joined an already sprawling surveillance infrastructure that is anchored by the Automated Targeting System (ATS), DHS's most comprehensive information platform that is both a system of records and an aggregation and search platform for other DHS systems of records.

38.    For the past two decades, ATS has served as DHS's platform for storing, maintaining, accessing, and querying information about the movement of people and goods in and out of the United States. DHS uses ATS to vet travelers, transportation crew members such as pilots and flight attendants, and cargo. ATS allows DHS to compare information against law enforcement, intelligence, and other enforcement data. DHS uses this information to conduct risk-based assessments to make border security decisions, such as when particular people or cargo warrant additional screening while in transit.[24]

39.    Records in ATS can be disclosed to other government law enforcement agencies, including federal agencies; state, tribal, local, or foreign government agencies; or multilateral government organizations.[25]

---

[22] *See* Dell Cameron, *ICE Wants to Build Out a 24/7 Social Media Surveillance Team*, WIRED (Oct. 3, 2025, 9:21 AM), https://perma.cc/KYY3-YE5E.

[23] *See* Jude Joffe-Block, *Your Data is Everywhere. The Government is Buying It Without a Warrant*, NPR (Mar. 25, 2026, 5:00 AM ET), https://perma.cc/FP62-8YE2.

[24] U.S. Dep't of Homeland Sec., *DHS/CBP/PIA-006 Automated Targeting System* (Dec. 11, 2024), https://perma.cc/LB22-ERZL (originally published Jan. 2017).

[25] Privacy Act of 1974; U.S. Customs and Border Protection, DHS/CBP-006-Automated Targeting System, System of Records, 77 Fed. Reg. 30,297, 30,301 (May 22, 2012).

COMPLAINT                                                                    Case No.

40.    ATS allows users to search and access data across a vast array of government databases and systems to provide a consolidated view of data about a specific person or entity.[26] ATS accesses, ingests, and stores records from more than a dozen federal systems.[27] It also accesses information from commercial data aggregators,[28] which provide ATS with license plate reader information, among other types of data.[29]

41.    DHS also stores and maintains information in ATS itself, which can include unique information ATS collects as well as information collected in different systems of records that DHS agents access through ATS.[30]

42.    When DHS agents use ATS to create reports or analyses, such use creates additional records within ATS that are subject to the Privacy Act.[31]

**1.    ATS's Facial Recognition Capability**

43.    ATS allows DHS to identify people of interest by using facial recognition to compare images taken in the field by agents against pre-existing photographs that ATS maintains or accesses, including photographs associated with ordinary traveler records, such as passport photographs.[32]

---

[26] U.S. Dep't of Homeland Sec., DHS/CBP/PIA-006(d), Privacy Impact Assessment Update for the Automated Targeting System – TSA/CBP Common Operating Picture Phase II, at 1–2 (Sep. 16, 2014), [hereinafter 2014 ATS PIA], https://perma.cc/L2WE-5JVP.

[27] 77 Fed. Reg. at 30,303.

[28] *Id.*

[29] U.S. Dep't of Homeland Sec., DHS/CBP/PIA-006(e), *§ 2.7 Commercial License Plate Reader Information, in* Privacy Impact Assessment Update for the Automated Targeting System, at 77 (July 24, 2019), https://perma.cc/5CM3-4EJZ (cited addendum published July 24, 2019).

[30] 2014 ATS PIA at 10.

[31] *Id.*

[32] U.S. Dep't of Homeland Sec., DHS/CBP/PIA-006(e), *§ 1.2.1 ATS Biometric Vetting Using Facial Recognition, in* Privacy Impact Assessment Update for the

- 12 -

44.    DHS agents can also create "derogatory" records, sometimes called "Lookout Records," containing photographs and other biographic identifiers associated with people who have provoked an agent's suspicion.[33] These derogatory records are aggregated and stored in or accessible through ATS, which DHS agents can also use to compile "galleries" of photographs related to derogatory information.[34] When an agent enters a photograph or other biographic information into ATS to generate a gallery, the new information remains accessible in ATS for generating new photograph galleries.[35]

45.    DHS agents can conduct facial recognition "Super Query" searches that use these galleries when they "manually upload the photograph of a subject of interest into the federated query function to search ATS data holdings."[36] This facial recognition function allows DHS agents to identify a "subject of interest" using an image as if the agent had entered other personally identifying information such as their name or Social Security Number.

---

Automated Targeting System, at 22 (July 24, 2019), https://perma.cc/5CM3-4EJZ (cited addendum published Dec. 12, 2019).

[33] *Id*. at 25.

[34] *Id*.

[35] *Id*. at 29.

[36] *Id*. at 25. ATS's "federated query" function "allows users to search data across many different databases and systems to provide a consolidated view of data about a person or entity." *Id*. at 1; *see also id*. at 27.

- 13 -

46. Typically, DHS retains records stored in ATS for 15 years.[37] Investigative intelligence information can be stored for 30 years.[38] And if DHS considers a person a "watchlist match" or a "watchlist lookout," their information can be stored for 75 years.[39]

## 2. ATS's System of Records Notice

47. Per the Privacy Act's SORN requirements, ATS is governed by the DHS/CBP-006 Automated Targeting System SORN, 77 Fed. Reg. 30,297 (May 22, 2012). As DHS explained when it published the most recent SORN revisions in 2012, ATS was designed "to efficiently perform risk assessments on information pertaining to international travelers and import and export shipments attempting to enter or leave the United States."[40]

48. The SORN consistently reflects ATS's purpose to "support CBP in identifying individuals and cargo that need additional review across the different means or modes of travel to and from the United States."[41] For example, the SORN authorizes DHS to maintain records on nine categories of individuals, including (1)

[37] U.S. Dep't of Homeland Sec., DHS/CBP/PIA-006(e), *§ 2.3 Retention of Information from Electronic Devices in the Automated Targeting System, in* Privacy Impact Assessment Update for the Automatic Targeting System, at 55 (July 24, 2019), https://perma.cc/5CM3-4EJZ (cited addendum published May 28, 2020).

[38] U.S. Dep't of Homeland Sec., Privacy Impact Assessment for the Analytical Framework for Intelligence (AFI), at 9 (June 1, 2012) [hereinafter 2012 AFI PIA], https://perma.cc/CS59-XEE5.

[39] U.S. Dep't of Homeland Sec., DHS/CBP/PIA-006(e), *§ 1.3 Transportation Security Administration (TSA) Secure Flight Passenger Data (SFPD) Vetting, in* Privacy Impact Assessment Update for Automatic Targeting System, at 35, 37 (Jan. 13, 2017), https://perma.cc/5CM3-4EJZ (citing addendum published Dec. 12, 2019); see also U.S. Dep't of Homeland Sec., Privacy Impact Assessment for the TECS System: CBP Primary and Secondary Processing, at 15 (Dec. 22, 2010), [hereinafter 2010 TECS PIA], https://perma.cc/DY6T-RPDN ("CBP has determined it needs to maintain the Subject Record for a period of 75 years[.]").

[40] 77 Fed. Reg. at 30,297.

[41] *Id*. at 30,298.

- 14 -

COMPLAINT                                                    Case No.

operators, crew, and passengers entering, exiting, or transiting through the US; (2) crew members in commercial aircraft; and (3) importers or exporters, among others.[42]

49.    Similarly, the SORN authorizes DHS to maintain in ATS certain categories of records that identify passengers and provide details on their travel, describe cargo being imported or exported from the country, or contain information that "is relevant to the border security mission of the Department."[43]

50.    DHS cites seven statutory authorities for the maintenance of ATS.[44] All of the cited statutory authorities deal with regulations on customs, duties, and border crossings,[45] immigration enforcement,[46] and international terrorism prevention.[47]

51.    The SORN also lists several purposes for which ATS data can be used, including most prominently the prevention and detection of terrorism, the

---

[42] *Id.* at 30,299.

[43] *Id.* at 30,300.

[44] 77 Fed. Reg. at 30,300 ("ATS derives its authority from 19 U.S.C. 482, 1461, 1496, 1581, 1582; 8 U.S.C. 1357; 49 U.S.C. 44909; the Enhanced Border Security and Visa Reform Act of 2002 (EBSVRA) (Pub. L. 107–173); the Trade Act of 2002 (Pub. L. 107–210); the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA) (Pub. L. 108–458); and the Security and Accountability for Every Port Act of 2006 (SAFE Port Act) (Pub. L. 109–347).").

[45] 19 U.S.C. § 482 (regulating the search of vehicles for items subject to duties); 19 U.S.C. § 1461 (regulating the inspection of merchandise and baggage coming into the United States); 19 U.S.C. § 1496 (regulating the examination of baggage coming into the United States to assess duties and declarations); 19 U.S.C. § 1581 (regulating the boarding of vessels); 19 U.S.C. § 1582 (regulating searches of people entering from foreign countries); Trade Act of 2002, Pub. L. No. 107-210, 116 Stat. 933 (regulating trade deals and updating tariff schedules); SAFE Port Act, Pub. L. No. 109-347, 120 Stat. 1884 (regulating port entries and authorizing port security measures like the screening of maritime containers for potential threats);

[46] 8 U.S.C. § 1357 (overview of powers of immigration officers and employees in immigration enforcement).

[47] *See* Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), Pub. L. No. 108-458, 118 Stat. 3638.

- 15 -

enforcement of border security and trade law, and to "otherwise assist in the enforcement of the laws enforced or administered by DHS, including those related to counterterrorism."[48]

52.    Nothing in the ATS SORN, nor in any other SORN pertaining to a DHS system of records, authorizes the maintenance of information describing U.S. citizens' or legal permanent residents' First Amendment expression solely because those citizens or legal permanent residents have engaged in that expression.

### 3.    ATS's Use in Customs and Border Protection's Trusted Traveler Programs

53.    Information maintained in or accessible through ATS also affects Americans' ability to participate in DHS Trusted Traveler programs, which facilitate expedited security screenings at U.S. points of entry for pre-approved, low-risk travelers. Global Entry is a Trusted Traveler Program that expedites clearance for travelers arriving in the United States from abroad, while TSA PreCheck expedites traveler screening through domestic airports.[49]

54.    ATS is CBP's primary tool for vetting travelers in its Trusted Traveler Programs. To do this, CBP regularly queries ATS for derogatory information that may warrant suspending or revoking a traveler's trusted status.

55.    A person seeking to qualify for one of CBP's Trusted Traveler Programs must complete a background check that includes a review of criminal, law enforcement, customs, immigration, agriculture, and terrorist indicators. Applicants must also provide fingerprints and undergo an interview with a CBP officer.

56.    A person is not eligible for Global Entry if they have been convicted of a criminal offense; have pending criminal charges or outstanding warrants; are the

---

[48] 77 Fed. Reg. at 30,301.

[49] A U.S. citizen or lawful permanent resident who is enrolled in Global Entry is eligible to participate in TSA PreCheck.

COMPLAINT                                                      Case No.

subject of ongoing investigation by any federal, state, or local law enforcement agency; or cannot satisfy CBP that they are low-risk.

57.     CBP suspends or revokes a Trusted Travel Program participant's status when CBP determines that new records available through ATS warrant such a change. The reasons CBP may change a participant's status include "a law enforcement violation, derogatory information related to terrorism, membership expiration, or any other legitimate reason to warrant suspending or revoking trusted status and conducting a regular primary inspection."[50]

58.     While CBP queries ATS in connection with a traveler's movement through airports, queries are also run even when a member of CBP's Trusted Traveler Programs does not have plans to travel. This continuous vetting allows CBP to review and consider a Trusted Traveler Program participant's status when ATS obtains new derogatory information.

## C.     The Government's Rescission of Policies Constraining Protester Surveillance

59.     Since January of 2025, the Trump Administration has rescinded policies that previously protected Americans engaged in speech and association from government surveillance. These rescissions have muddled or dismantled many of the internal checks DHS previously maintained on collecting records describing Americans' First Amendment exercise, using facial recognition technology, and using technology to capture sensitive personal identifying information. One by one, these limits have been removed, deemed "outdated," or labeled "archived."

[50] U.S. Dep't of Homeland Sec., *Annual Performance Report, Appendix A: Measure descriptions, data collection methodologies, and verification and validation information, FY2022–FY2024* (Mar. 13, 2023), https://perma.cc/P95C-AZA7.

- 17 -

### 1.    The 2023 Facial Recognition Directive

60.    On September 11, 2023, DHS issued Directive 026-11, "Use of Face Recognition and Face Capture Technologies."[51] The Directive governed all DHS use of facial recognition and facial capture technology for any purpose.[52] It defined facial recognition as anything that "compares an individual's facial features to available images or video for verification or identification purposes" and facial capture as "any combination of face detection and face collection technologies used to detect and/or extract a face from an image or video[.]"[53]

61.    The Directive mandated that "DHS does not use [facial recognition] or [facial capture] technologies to profile, target, or discriminate against any individual solely for exercising their Constitutional rights or to enable systemic, indiscriminate, or wide-scale monitoring, surveillance or tracking."[54]

62.    From September 11, 2023, until around February 2025, the Directive remained available and operative on DHS's website. Within a month of President Trump taking office, between February 14 and 19, 2025, DHS rescinded the Directive and removed it from its website.[55]

63.    The Directive was not even maintained as "archived" material; since at least February 19, 2025,[56] the Directive's URL has displayed a "page not found"

---

[51] U.S. Dep't of Homeland Sec., *Use of Face Recognition and Face Capture Technologies*, Directive No. 026-11 (Sep. 11, 2023), https://perma.cc/8EQF-GQUG.

[52] *Id*. at 1.

[53] *Id*.

[54] *Id*. at 5.

[55] *See* Internet Archive, Wayback Machine, *Calendar*, https://web.archive.org/web/20250501000000*/https://www.dhs.gov/sites/default/files/2023-09/23_0913_mgmt_026-11-use-face-recognition-face-capture-technologies.pdf.

[56] U.S. Dep't of Homeland Sec., *Page Not Found*, https://perma.cc/989H-FURQ (archived Feb. 19, 2025).

message.[57] DHS's actions since the Directive was archived, including its repeated use of facial recognition software and efforts to photograph the faces of people engaged in legal observation or protest, *see infra* ¶¶ 77, 79-87, 91, 97, 106, show that DHS no longer treats this directive as operative.

**2.    The 2016 Mobile Application Privacy Policy**

64.    On March 30, 2016, DHS issued its "Privacy Policy for DHS Mobile Applications," which governed any mobile applications "developed by, on behalf of, or in coordination with the Department."[58] The Privacy Policy applied to DHS mobile apps intended for use either by DHS employees or the public.[59]

65.    Among other things, the Privacy Policy placed limitations on DHS mobile apps' collection or use of personally identifying information or sensitive personally identifying information (which includes biometric information like photographs), precluding DHS mobile apps from collecting or using personally identifying information "unless directly needed to achieve a DHS mission purpose[.]"[60] If collection of personally identifying information or sensitive personally identifying information was authorized because it was "directly necessary to achieve a DHS mission purpose," the Privacy Policy still required DHS to "document[] and justif[y]" the collection or use "in the mobile app's Privacy Compliance Documentation."[61][62]

---

[57] U.S. Dep't of Homeland Sec., *Page Not Found*, https://perma.cc/H3FT-E457 (last viewed July 9, 2026).

[58] U.S. Dep't of Homeland Sec., Instruction No. 047-01-003, Privacy Policy for DHS Mobile Applications 1 (Mar. 30, 2016), https://perma.cc/NL6C-5BQJ (quoted language unaffected by 2018 redline revisions incorporated into cited document).

[59] *Id.* at 2.

[60] *Id.* at 8.

[61] *Id.*

[62] The Privacy Policy defined "Privacy Compliance Documentation" as "any document required by statute or by the Chief Privacy Officer that supports compliance with DHS privacy policy, procedures, or requirements, including but not

COMPLAINT                                                                    Case No.

66.    From March 30, 2016, until approximately February 2025, the Mobile App Privacy Policy was operative DHS policy. Within approximately one month of President Trump taking office in 2025, DHS rescinded the Privacy Policy and archived it on DHS's website. Since approximately February 25, 2025, DHS has characterized the Privacy Policy as "Archived Content" that "contains outdated information that may not reflect current policy or programs."[63]

**D.    DHS's New Policy of Collecting Legal Observer and Protester Information**

67.    As the Administration rescinded policies that had previously protected Americans against DHS collection of their personal information, it dramatically increased its surveillance of Americans engaged in legal observation or protest activities protected by the First Amendment and adopted a new policy to collect and maintain personally identifying information on the people engaged in those activities.

68.    Upon information and belief, after March or April 2025, as DHS rapidly and dramatically increased its presence in American cities, the agency adopted a policy of encouraging, directing, or allowing DHS agents to record and maintain records describing Americans' legal observation and protest activities, even when that First Amendment exercise is obvious and the creation of the records occurs without any valid relationship to a law-enforcement activity. DHS's new Protester Surveillance Policy is enabled by DHS's rescission of the 2023 Facial Recognition Directive and 2016 Mobile Application Privacy Policy, each of which would have impeded DHS's new policy.

69.    Upon information and belief, since March or April 2025, DHS agents have engaged in widespread recording, and then maintaining records detailing,

---

limited to Privacy Impact Assessments (PIAs), System of Records Notices (SORNs)," and/or formal agreements such as Memoranda of Understanding or Memoranda of Agreement. *Id.* at 3.

[63] U.S. Dep't of Homeland Sec., *Privacy Policy for DHS Mobile Applications*, https://perma.cc/9FH8-DJ4M (archived July 9, 2026).

COMPLAINT                                                                 Case No.

Americans' protest and legal observation activity. This recording and record maintenance has been well publicized and is the topic of robust public discussion, and yet, upon information and belief, DHS has not stopped them.

70.    As of at least late 2025, DHS also began "tracking the names of protesters in an internal database."[64] According to two ICE officials quoted in Reuters reporting, the records DHS maintains in the database include protesters' names, photographs, actions that provoked the government's suspicion (including legal observation or protest activities), locations, and license plates.[65] Upon information and belief, these records are maintained in, or accessible through, one or more DHS systems of records including ATS.

71.    DHS's Protester Surveillance Policy was adopted without any public notice, nor is it reflected in any revised or newly promulgated SORN for any DHS system of records.

72.    Nonetheless, DHS's Protester Surveillance Policy has been apparent in DHS's observable use of drones, cameras, cell phones, and other technology to capture images, video, geolocation, and timestamping documentation of Americans' legal observation and peaceful protest activities.

73.    In June of 2025, residents of Los Angeles demonstrated in protest of the increased presence of federal immigration agents in the area. The Department of Homeland Security systematically surveilled those protesters, including by capturing their activities using MQ-9 Predator drones.[66] The drones "come equipped with cutting-edge infrared heat sensors and high-definition video cameras, and can track

---

[64] Ted Hesson, Kristina Cooke, & Brad Heath, *ICE is cracking down on people who follow them in their cars*, Reuters (Feb. 10, 2026), https://perma.cc/4J25-CEP2.

[65] *Id.*

[66] U.S. Representative Jimmy Gomez, In the News, *Los Angeles Times: Predator Drones Shift from Border Patrol to Protest Surveillance* (Sep. 22, 2025), https://perma.cc/8SB2-UMVY.

- 21 -

scores of individuals within a 15-nautical-mile radius."[67] DHS posted footage from the Los Angeles drone flights to its X account.[68]

74. In September of 2025, the Department of Homeland Security launched Operation Midway Blitz in Chicago, with a massive surge of DHS agents descending upon the city. Agents involved in the blitz engaged in sweeping immigration enforcement actions[69] and frequently interacted with protestors.[70] Months later, ICE posted drone footage of Chicago protesters to its own Facebook page.[71] ICE agents relied upon facial recognition tools to photograph Chicago residents during this operation,[72] with a lawsuit filed by the City of Chicago and State of Illinois alleging DHS utilized such tools "in the field over 100,000 times."[73] This surveillance extended to legal observers and protestors. In one example, Marimar Martinez, a

[67] *Id.*

[68] Homeland Security (@DHSgov), X (June 10, 2025, 5:43 PM ET), https://x.com/DHSgov/status/1932554361840022016 (caption preserved at https://perma.cc/PX7K-R5F3).

[69] Mark Rivera et al., *Thousands arrested, deported by immigration agents during Operation Midway Blitz, new records reveal*, ABC 7 (Apr. 1, 2026), https://perma.cc/8TFE-TGSP.

[70] William Brangham & Ryan Connelly Holmes, *ICE escalates aggressive raids in Chicago as Trump moves to deploy National Guard*, PBS News (Oct. 9, 2025), https://perma.cc/7QHZ-WK9G; Heather Schlitz, *'We're not a violent city': Chicago locals take on ICE block-by-block, Reuters* (Nov. 3, 2025), https://perma.cc/TB8M-W3XJ; Sergio Martínez-Beltrán & Marisa Peñaloza, *As tensions rise in Chicago, volunteers patrol neighborhoods to oppose ICE and help migrants escape*, NPR (Oct. 17, 2025), https://perma.cc/34P2-VC7M.

[71] Eva Dou, *ICE amps up its surveillance powers, targeting immigrants and antifa*, Wash. Post (Oct. 17, 2025), https://perma.cc/5QKK-XWC6.

[72] Kevin Collier et al., *How ICE agents are using facial recognition technology to bring surveillance to the streets*, NBC News (Feb. 6, 2026), https://perma.cc/6UWZ-74UT.

[73] Compl. ¶ 109, *Illinois v. DHS*, No. 1:26-cv-00321 (N.D. Ill. Jan. 12, 2026), Dkt. No. 1, https://perma.cc/9BFX-J3C5.

- 22 -

woman who was later shot five times by a Border Patrol agent while engaging in legal observation, has asserted that her photograph and social media account were circulated by DHS agents and verified in a DHS database days before she was shot.[74]

75.    Around December of 2025, DHS began its "largest [] operation ever" in Minnesota's Twin Cities, which it dubbed Operation Metro Surge.[75] As DHS deployed approximately 2,000 federal agents to Minneapolis and St. Paul, residents engaged in peaceful, lawful protest and observation of the government's unprecedented immigration enforcement activity. For example, Twin Cities residents bore witness to immigration enforcement actions taking place on public streets, sidewalks, and parking lots by observing the events in person and recording them on their phones.

76.    On January 7, 2026, Renee Good was shot and killed on a Minneapolis street by a federal agent. Thousands of residents gathered to mourn her death and express opposition to the federal government's actions.[76] Within days, reports emerged that federal agents were photographing legal observers' and protesters' faces and license plates, using their names in first-time interactions, and leading them to their own homes.[77]

77.    In January, a memorandum circulated to federal agents temporarily assigned to the Twin Cities directed them to "capture all images, license plates, identifications, and general information on hotels, agitators, protestors, etc., so we

---

[74] Ruby Cramer, *Shot by Border Patrol, then called a "Domestic Terrorist"*, The New Yorker (Mar. 12, 2026), https://perma.cc/4WMH-DV4T.

[75] Rebecca Santana & Mike Balsamo, *Homeland Security plans 2,000 officers in Minnesota for its 'largest immigration operation ever'*, AP News (Jan. 6, 2026), https://perma.cc/SVL7-4H4A.

[76] Erica Zurek, Alex V. Cipolle & Ellie Roth, *Thousands gather to mourn Renee Good, Minneapolis woman shot and killed by ICE agent*, MPR News (Jan. 7, 2026), https://perma.cc/J89Z-RR9H.

[77] Jon Collins, *Privacy advocates: ICE using private data to intimidate observers and activists*, MPR News (Jan. 13, 2026), https://perma.cc/T337-GEJH.

COMPLAINT                                                        Case No.

can capture it all in one consolidated form[.]"[78] Below is an image of federal immigration agents deployed to the Twin Cities engaged in capturing those types of images.



78.     Many Minnesota residents have engaged in legal observation from their cars, taking care to comply with traffic safety laws and maintain safe distances from federal immigration agents on the road. During this form of legal observation, Minnesota residents have peacefully observed federal immigration agents' actions from their cars and sometimes recorded those actions on their phones.

79.     Among Minnesota legal observers, it has become common to experience being photographed or filmed by federal agents while engaging in legal observation or protest. In many cases, federal agents have approached Minnesota legal observers while holding their phones out and photographing or taking video of the observer's face or license plate. In multiple incidents, federal agents were specifically using the app Mobile Fortify to scan observers' faces, telling them that their faces would be now added to a database.[79]

---

[78] Jeff Winter, *Priscilla Alvarez, Alex Pretti broke rib in confrontation with federal agents a week before death, sources say*, CNN (Jan. 27, 2026), https://perma.cc/CK27-7S7W.

[79] Sheera Frankel & Aaron Krolik, *How ICE Already Knows Who Minneapolis Protesters Are*, N.Y. Times (Jan. 30, 2026), https://perma.cc/R7XK-QUCK.

- 24 -

COMPLAINT                                                                    Case No.

80.    Among Minnesota legal observers, it has become a common experience to be identified by federal agents by name despite providing no identification or otherwise engaging with the agents. In many cases, the first exchange Minnesota legal observers have had with federal immigration agents was being called by their name when an agent exits their own car and approaches the legal observer to initiate an interaction.

81.    Many Minnesota legal observers have learned they've been identified by federal immigration agents despite having never spoken to them at all: In many cases, Minnesota residents engaging in legal observation by driving at a safe distance behind federal immigration agents' vehicles have experienced those agents leading them to their own home addresses. The experience of being led back to one's own home by federal immigration agents is so widespread that Minnesota residents have coined a term for it: being "driven home by ICE."[80]

82.    In late January 2026, the government initiated Operation Catch of the Day in Portland, Maine.

83.    Residents in Maine reacted similarly to residents in Minnesota, mobilizing to engage in peaceful legal observation and protest out of concern that their neighbors would be mistreated by federal government agents.

84.    As in Minnesota, Maine legal observers' and protesters' faces, vehicles, and license plates were routinely photographed and filmed by federal immigration

---

[80] In addition to tracking First Amendment exercise in Minnesota's public spaces, Defendants appear to have monitored online speech concerning immigration enforcement in Minnesota: In June, ICE confronted a New York poll worker about a social media post she made about the officer who shot Good and federal agents came to the polling station where she worked. Patrick Whittle, *NY Election Worker Says Fed Confronted Her at Polls Over Post Criticizing ICE*, NBC New York (June 28, 2026), https://perma.cc/QY8X-82YQ. The same month, ICE agents stationed themselves outside of a vote center in Simi Valley, California. Wes Woods II, *UPDATED: ICE Presence Outside Simi Valley Vote Center Raises Alarms*, Yahoo! News (June 2, 2026), https://perma.cc/65UZ-XUEA.

- 25 -

agents during Operation Catch of the Day. When one legal observer asked a federal agent why he was recording her, he responded: "Cause we have a nice little database. And now you're considered a domestic terrorist, so have fun with that."[81]

85.    Another Maine legal observer experienced a federal agent filming her car and her face at close range. An agent then said: "I hope you know that if you keep coming to things like this, you are going to be on a domestic terrorist watchlist. Then we're going to come to your house later tonight." The agent then turned to another agent and said: "She's just going on the domestic terrorist watchlist." The other agent replied: "Oh, absolutely." He later repeated: ". . . she's just going on a domestic terrorist watchlist. I just want to put it in." The agents made sure to photograph another legal observer who joined the scene, repeating again: "Take a picture of this guy! We'll put him on the watchlist."[82]

86.    Legal observers in other areas with heightened ICE enforcement, like the Washington D.C. area, Tennessee,[83] and southern Florida[84] have also claimed that they have been photographed or personally identified by agents while engaged in legal observation or protest.

87.    In an April 2026 response to congressional correspondence questioning DHS's publicly visible surveillance of legal observers and protesters, DHS has confirmed that in connection with "protest activity directed at ICE operations and facilities,"  DHS agents "collected information to identify individuals" that it

---

[81] Compl. ¶ 45, *Hilton v. Noem*, No. 2:26-cv-00092 (D. Me. Feb. 23, 2026), Dkt. No. 1.

[82] *Id.* ¶¶ 64, 65, 67.

[83] Video posted by Jenna King (@jennalynnking), Instagram (May 7, 2026), https://www.instagram.com/reel/DYDv2jIp6mF/ (caption preserved at https://perma.cc/L9KK-V6P5).

[84] Video posted by Latina Rebels (@latinarebels), Instagram (Oct. 25, 2025), https://www.instagram.com/reel/DQPWSxGiU3m/ (caption preserved at https://perma.cc/657C-VD9T).

COMPLAINT                                                                      Case No.

characterized as potentially "obstruct[ing] or interfer[ing] with ICE operations."[85] DHS also confirmed that its surveillance is ongoing, as "ICE collects information to identify the person(s) with whom [an] officer or agent is engaging," including "essential biographic and biometric information and situational details[,]" even if the legal observer is "not arrested or detained[.]" When an agent records "any information collected during those encounters . . . [it] is treated as an official government record."[86]

### 1.     The Government's Surveillance of Nicole Cleland

88.     Nicole Cleland is a 56-year-old resident of Richfield, Minnesota. On January 10, 2026, she participated in legal observation in her community by driving at a safe distance near cars that she believed were being driven by federal immigration agents. The distance Cleland maintained between her car and the cars she suspected were being driven by federal agents was significant enough to allow for one or more other cars to drive in between.

89.     As Cleland engaged in this legal observation, another Twin Cities resident engaged in the same activity in a separate car.

90.     After a short time, the cars Cleland suspected were being driven by federal immigration agents stopped in the street. Cleland felt she had no option but to stop her own car.

91.     A federal agent in full camouflage fatigues exited one of the cars and approached Cleland's car. That agent addressed Cleland by her name and asserted that the agent had "facial recognition" and that his "body cam" was recording. The agent confirmed that he worked for Border Patrol. The Border Patrol agent asserted

---

[85] Letter from Todd M. Lyons, Acting Director of ICE, to Rep. Maxwell Alejandro Frost, at 1 (Apr. 21, 2026), https://perma.cc/3F9L-ZG5W.

[86] *Id*. at 2. In the same communication, DHS confirmed that it can obtain further information "from open-source sources" or other "federal state, [or] local" law enforcement agencies. *Id*.

COMPLAINT                                                               Case No.

that Cleland was "impeding" his work and threatened Cleland with arrest if, in the agent's view, she further "impeded" their work. The agent did not explain how following at a safe distance on a public road "impeded" agents' work or why it was illegal. The Border Patrol agent then returned to his car and left.

92.    Three days later, on January 13, Cleland received an emailed notice that her Global Entry/TSA Pre-check had been revoked by the Department of Homeland Security. The notice did not disclose the reason that Cleland's status was revoked.

93.    Cleland reasonably believes that the Department of Homeland Security revoked her status because she engaged in legal observation of federal immigration agents in her community. Cleland had no other interactions with law enforcement in between her encounter with federal immigration agents and the revocation of her Global Entry/TSA PreCheck status, nor had she had any since obtaining Trusted Traveler status in 2014. Cleland did not engage in unlawful activity or otherwise take any action suggesting that she posed a security risk during this time period. The only activity Cleland engaged in that involved contact with law enforcement was her exercise of her First Amendment right to peacefully engage in legal observation of federal immigration agents' activities.

94.    Following her interaction with federal immigration agents and the revocation of her Trusted Traveler status, Cleland ceased engaging in legal observation out of fear that, as the federal immigration agent had threatened, she would be arrested if she continued. She continues to engage in other lawful activities that seek to support members of her community who have been harmed by federal immigration enforcement actions.

## 2.    The Government's Surveillance of Jacquelyn Ivey

95.    Jacquelyn Ivey is a resident of Greenville, South Carolina. In late November, 2025, she learned that immigration enforcement actions had escalated in Charlotte, North Carolina. On November 18, she drove from Greenville to Charlotte in order to engage in legal observation of federal immigration enforcement activity.

COMPLAINT                                                                    Case No.

96.    Ivey parked in a parking lot between two buildings, where she observed and recorded on her phone activity by people who appeared to be federal immigration agents. Ivey did not see any gate, signage, or other indication that the area where she parked was not open to the public.

97.    Between six and eight federal agents approached Ivey in two cars. Upon exiting their cars, the agents surrounded Ivey in her car. The agents were wearing full fatigues and carried weapons. One of the agents asserted that Ivey was on "private property . . . federal property" and directed Ivey to move her car. Ivey immediately indicated that she would move and clarified that she did not understand that she was on private property. The agent responded that he would "take [her] license plate" and pulled out his mobile phone, directing it at Ivey's face before walking around to the back of her car.



98.    After returning to the driver's side window of Ivey's car, the agent asked Ivey for identification. Ivey responded that she did not believe she had to provide her identification because she was complying with the agent's instruction to leave the area. The agent responded that Ivey was "on federal property, and you're videoing"

before again demanding that Ivey provide her driver's license. Ivey reiterated that she was complying with the agent's direction to leave the area and asserted, again, that she did not need to provide her identification. The agent responded: "You do."

99.    After Ivey attempted to explain a third time why she did not believe she needed to provide her identification, the agent responded: "I'm not asking you nicely now, I'm telling you." The agent clarified that Ivey needed to provide her driver's license because she was being "detained" for being on federal property. After Ivey asked a fourth time whether she could simply leave, the agent responded that she must be identified before she could leave. While Ivey pulled out her license to give to the agent, she asked whether it is a crime to be on federal property and pointed out that a man in the same area was not being detained even though he was "sitting right here eating his lunch." The federal agents did not explain why the man who did not appear to be engaging in legal observation had not been detained. After photographing Ivey's face, license plate, and driver's license, the federal agents allowed her to leave.

100.    Ten days after her interaction with and identification by federal agents, Ivey's Global Entry was revoked. Ivey had no other interactions with law enforcement in between her encounter with federal immigration agents and the revocation of her Global Entry status, nor did she have any in the time between receiving Trusted Traveler status in January 2025 and her encounter with the federal agents, save two traffic stops more than six months before. Ivey did not engage in unlawful activity or otherwise take any action suggesting that she poses a security risk during this time period. The only activity Ivey engaged in proximate to the revocation of her Trusted Traveler status that involved contact with law enforcement was her exercise of her First Amendment right to peacefully engage in legal observation of federal immigration agents' activities.

COMPLAINT                                                                Case No.

101. On March 4, 2026, the Huffington Post published a story detailing the interaction Ivey had with federal agents and the revocation of her Global Entry.[87]

102. On March 17, Ivey received a notification that the Customs and Border Protection Ombudsman had overturned the revocation of her status.

103. Despite the reinstatement of her status, Ivey has received no confirmation that the government has expunged any record that triggered her revocation. Ivey has continued to engage in her constitutionally protected legal observation activities, but she worries that her identity is now on a list of Americans the federal government deems to be a threat as a result of her First Amendment activities.

### 3. The Government's Surveillance of Anna Walker

104. Anna Walker is a resident of San Diego, California. In late March, Walker was traveling through the San Francisco Airport when she encountered a woman being detained by federal immigration agents. Walker filmed the incident. Moved by her experience, she began participating in legal observation upon her return home. Walker's legal observation activities have involved observing and recording the activities of federal immigration agents while they operate in public spaces, such as in public parking lots. When engaging in legal observation, Walker has maintained a safe distance from federal immigration agents and has never sought to interfere with their activities.

105. On April 1, Walker was driving her car in a public Target parking lot when she saw a truck that she believed was being driven by federal immigration agents. Walker followed the truck at a safe distance to observe the federal immigration agents' activities as it made circles around the Target parking lot. The truck made a sudden stop, causing Walker to stop her car also. Two other cars quickly drove toward Walker, boxing her in place.

---

[87] Jamieson, *Watching ICE Agents?*, *supra* note 5.

- 31 -

COMPLAINT                                                                Case No.

106. Three federal immigration agents, wearing badges, exited their vehicles and approached Walker's car on foot. While one pulled on Walker's car door handle and pounded on her window while the other two approached and took out their phones. One agent walked up to Walker's passenger side window and aimed the phone camera at her face. The other agent walked to the front of Walker's car and aimed his phone camera at her license plate.

107. The federal immigration agent who approached Walker's car door pulled out a credential that identified him as an agent of the Department of Homeland Security's Homeland Security Investigations.

108. For approximately 20 minutes, the HSI agents kept their vehicles parked or idling around Walker's car and did not allow her to leave the parking lot or otherwise move her car. Walker did not provide her driver's license at any point, nor did the agents ask her to provide identification. The agents moved their vehicles and allowed Walker to leave only after she called 911.

109. Five days later, Walker received an email informing her that there had been a change to her Trusted Traveler status. Upon signing into her Global Entry

- 32 -

account to check its status, Walker learned that it had been revoked. Walker had no other interactions with law enforcement in between her encounter with federal immigration agents and the revocation of her Global Entry, nor did she have any since obtaining Global Entry in 2022.

110. After Walker's Global Entry was revoked, she contacted a reporter and described her experience. That reporter sent an inquiry to the Department of Homeland Security about Walker's Global Entry revocation on April 9 in which he provided her full name and date of birth.

111. On April 10, Walker received an email alerting her that her Trusted Traveler status had changed once again. Upon signing into her Global Entry account to check its status, Walker learned that it had been reinstated.

112. Despite the reinstatement of her status, Walker has received no confirmation that the government has expunged any record that triggered her revocation. She has continued to engage in constitutionally protected legal observation activities, but she worries that her identity is now on a list of Americans the federal government deems to be a threat as a result of her First Amendment exercise.

## E.    Injuries to Plaintiffs

113. Plaintiffs have suffered and are suffering various injuries as a result of DHS's nationwide policy of collecting and maintaining records describing Americans' exercise of their First Amendment rights.

### 1.    Injuries Resulting from DHS's Rescission of Its Prior Policies

114. Individual Plaintiffs have been harmed by Defendants' rescission of the 2023 Facial Recognition Directive and 2016 Mobile Application Privacy Policy because, had those policies been in effect, they would have precluded the collection and maintenance of the records describing Individual Plaintiffs' First Amendment exercise. As a result, the injuries resulting from Defendants' collection and maintenance of records describing Individual Plaintiffs' First Amendment exercise,

- 33 -

as well as the injuries resulting from Defendants' retaliatory revocation of Individual Plaintiffs' Trusted Traveler status that was facilitated by the collection and maintenance of those records, are traceable to Defendants' rescission of the 2023 and 2016 policies.

### 2. Injuries Resulting from the Creation and Maintenance of Plaintiffs' Records

115. Individual Plaintiffs' records are among those collected and maintained by DHS under the Protester Surveillance Policy. DHS's collection and maintenance of those records exerts a chilling effect on Individual Plaintiffs' speech and causes them emotional distress.

116. In each instance, DHS agents limited Individual Plaintiffs' movement, ensured they were aware DHS was creating records describing their First Amendment exercise, and linked their creation of the records to Individual Plaintiffs' legal observation activity. This has caused each Individual Plaintiff to suffer chilling effects on their First Amendment-protected activities that would cause a person of ordinary firmness to self-censor.

117. None of the Individual Plaintiffs posed any safety risk to DHS agents, interfered with law enforcement activity, or presented themselves at an airport or entry point to the United States where they would expect their public movements to be monitored and documented by DHS. Instead, Individual Plaintiffs reasonably believe that DHS's documentation of Individual Plaintiffs' First Amendment exercise is a result of the government's hostility to Individual Plaintiffs' perceived beliefs based on their speech. And because of the government's hostility to Individual Plaintiffs' perceived beliefs, Individual Plaintiffs also reasonably fear the government has entered them onto a list of purported "domestic terrorists." This also has caused each Individual Plaintiff to suffer chilling effects on their First Amendment-protected activities that would cause a person of ordinary firmness to self-censor. In addition, it has caused Individual Plaintiffs emotional distress.

- 34 -

118.    Individual Plaintiffs have also suffered distress as a result of the federal government's offensive and unconsented invasion of their privacy resulting from its collection, maintenance, and potential disclosure and mishandling of their sensitive personal information, including their biometric identifying information.[88] For example, the fear of being on a government list of purported "domestic terrorists" has caused Jacquelyn Ivey such significant fear that, following the revocation of her Global Entry, she began sharing her location with a small circle of trusted friends in the hope that their knowledge of her whereabouts might help keep her safe. Anna Walker has felt fear and concern that she has exposed her friends to government retaliation through guilt by association with her, and has become particularly anxious when communicating with members of her community who she has not previously met, because she is unsure whether the government is seeking to monitor her activities. Nicole Cleland has self-censored some of her personal communications over electronic media for fear of government surveillance; experiences fear and anxiety each time she travels; and, until she successfully used it as identification at an airport, reasonably feared that in addition to terminating her Trusted Traveler status, the government may have invalidated her passport as well.

119.    Ultimately, Ivey and Walker have largely continued their peaceful First Amendment exercise because they do not want the government's actions to dictate whether they exercise their constitutional rights. But each experiences fear, anxiety, and emotional distress regularly as a result of Defendants' actions. Cleland has ceased legal observation activity entirely due to Defendants' intimidation and

---

[88] As far as Individual Plaintiffs are aware, absent the information the government collected when Individual Plaintiffs engaged in the above-described First Amendment exercise, the only personally identifying information about Individual Plaintiffs in ATS or any other DHS system of records would be information legally collected, including with their knowledge and consent, as a part of DHS's Trusted Traveler Program and Individual Plaintiffs' travel, such as their passport information and dates of entry or exit from the country.

COMPLAINT                                                                    Case No.

retaliation, but she has continued to remain active in her community despite fearing that the government may be tracking her movements, especially when she is in her car.

120.   Individual Plaintiffs also reasonably fear that the government's hostility toward their perceived political beliefs and its invasion of their privacy will continue or compound in the future if and when the federal government continues to surveil them. And because Individual Plaintiffs have no reason to believe that the government has expunged all records describing their First Amendment exercise, they reasonably fear that the government's invasion of their privacy and hostility to their perceived political beliefs will continue, as continued maintenance of the records facilitates the government's ability to access and use the records in the future.

121.   Additionally, Individual Plaintiffs are unable to discern where these records are being stored, how long they will be retained, who can access them, or how they could be used in the future to Individual Plaintiffs' detriment, which causes Individual Plaintiffs emotional distress and exerts a further chilling effect on their First Amendment-protected activities. DHS failed to publish in the Federal Register any new or revised SORN reflecting changes DHS made to the categories of people on whom the agency collects information, the routine uses of that information, or the agency's policies regarding the data's storage or retention. Without a new or revised SORN that lays out why and how data will be stored or used, Individual Plaintiffs are left without information they are entitled to under the Privacy Act about how the records about them will be stored, accessed, shared, or used.

**3.     Injuries Resulting from the Revocation of Trusted Traveler Status**

122.   In addition to the chilling effects and emotional distress flowing from being entered into a black-box system of records, DHS's decision to revoke the Individual Plaintiffs' Trusted Traveler status caused further injury by punishing them for their perceived political expression.

- 36 -

COMPLAINT                                                                 Case No.

123. DHS revoked Individual Plaintiffs' status after each experienced an interaction with DHS agents where the agents documented their First Amendment exercise.

124. No Individual Plaintiff was subject to any law enforcement violation or membership expiration that would provide grounds to revoke their Trusted Traveler status. DHS agents' collection of Individual Plaintiffs' information during their First Amendment-protected legal observation activities is the only identifiable basis for the revocation of Individual Plaintiffs' Trusted Traveler status.

125. Faced with these facts, Individual Plaintiffs reasonably believe that DHS revoked Individual Plaintiffs' Trusted Traveler status because DHS sought to retaliate against Individual Plaintiffs for the viewpoints they expressed in exercising their First Amendment rights. DHS's reaction to Individual Plaintiffs' lawful legal observation would chill a person of ordinary firmness from continuing to engage in that activity.

126. Though Jacquelyn Ivey and Anna Walker have each been notified that their Global Entry has been reinstated, neither has received confirmation that the government has expunged any record that triggered the revocation. Indeed, neither Ivey nor Walker were given an explanation for why the reinstatement occurred. Nor have Ivey or Walker received any assurance from the government that it will not revoke their Global Entry in the future if they continue to engage in legal observation. As a result, reinstatement does not mitigate the revocation's chilling effect.

### 4. Injuries Resulting from Trusted Traveler Status Not Being Reinstated

127. In addition, Nicole Cleland is experiencing ongoing injury arising from the revocation of her Trusted Traveler status, as it has not been reinstated.

128. As a result of the revocation, Cleland has lost the Trusted Traveler benefits she enjoyed for more than a decade, since 2014. Cleland has yet to travel internationally since her interaction with federal immigration agents and the

- 37 -

COMPLAINT                                                                                    Case No.

government's Trusted Traveler revocation, and she experiences fear and anxiety when considering planned future international travel because she fears that Defendants may seek to retaliate against her further when she does.

### 5.    EPIC's Injuries

129.    DHS's policy of recording and maintaining records describing Americans' First Amendment activities, and its lack of Privacy-Act-mandated transparency into how it maintains those records, have imposed organizational injury EPIC.

130.    EPIC seeks to protect privacy, freedom of expression, and democratic values in the information age. EPIC's work includes protecting Americans from mass surveillance, which EPIC views as one of the greatest threats to privacy and civil liberties in the United States. Among other activities, EPIC monitors, analyzes, and educates the public about the collection, use, retention, and transfer of personal information by federal agencies. EPIC routinely submits comments on SORNs published in the Federal Register and other proposed agency actions related to information databases and mobilizes its members and partners to do the same.

131.    DHS's national policy of recording Americans' legal observation in connection with federal immigration enforcement has dramatically expanded the federal government's surveillance apparatus to stifle dissent and target protesters. In response, EPIC has had to expend its limited resources to research, track, and focus public attention on DHS's surveillance efforts targeting protected activity. As part of these efforts, EPIC has analyzed the scant available technical and legal documentation concerning DHS's surveillance of protestors and legal observers; organized and led a presentation on DHS surveillance activities to students concerned about ideological targeting based on protected activity; compiled research about DHS's novel surveillance practices, including the agency's use of the Mobile Fortify app; submitted a Freedom of Information Act request to DHS concerning its monitoring of protests and other protected activity; composed an open letter calling

- 38 -

COMPLAINT                                                                Case No.

on DHS to halt its reliance on Mobile Fortify and demanding that the agency comply with its related transparency obligations;[89] organized a broad coalition of civil society organizations to endorse and disseminate the same letter;[90] and educated the public through EPIC's website[91] and news media[92] about DHS's surveillance practices and the threat they pose to privacy and civil liberties. EPIC has been forced to redirect significant staff time away from other organizational priorities in order to carry out these efforts, a diversion of resources that hinders EPIC's core mission of securing privacy, freedom of expression, and democratic values in the information age.

132.    EPIC is also injured by DHS's failure to provide the public with the Privacy-Act-mandated opportunity to submit comments before enacting its national policy of collecting and maintaining records on Americans' First Amendment activities. This failure imposes procedural injury on EPIC, as EPIC would have submitted information and arguments in an effort to inform DHS's practices.

133.    EPIC is also injured by DHS's failure to publish a revised SORN or SORNs reflecting the changes DHS has made to the categories of people about whom the agency collects information; the routine uses of that information; or the agency's policies and practices regarding storage, retrievability, access controls, retention, and disposal. For decades, EPIC has relied extensively on information that the Privacy

---

[89] Letter from EPIC et al. to Roman Jankowski, Chief Privacy Officer of U.S. Dep't of Homeland Sec. (Nov. 25, 2025), https://perma.cc/5JBC-P5EZ.

[90] *See, e.g.*, Dave Maass, *Rights Organizations Demand Halt to Mobile Fortify, ICE's Handheld Face Recognition Program*, Elec. Frontier Found. (Nov. 26, 2025), https://perma.cc/7XRJ-NAGP.

[91] *See, e.g.*, *EPIC, Coalition Call on ICE To End Its Use of Facial Recognition in the Field*, EPIC (Nov. 26, 2025), https://perma.cc/DNS9-N4ZX.

[92] *See, e.g.*, Dell Cameron & Maddy Varner, *ICE and CBP's Face-Recognition App Can't Actually Verify Who People Are*, WIRED (Feb. 5, 2026), https://perma.cc/6EB9-5XF9; Tom Schuba, *ICE has powerful facial recognition app Illinois cops are barred from using — with little apparent oversight*, Chi. Sun-Times (Oct. 31, 2025), https://perma.cc/FZL9-R92V.

COMPLAINT                                                                Case No.

Act mandates agencies to disclose, including information in SORNs and matching agreements. These documents are often the only publicly available records of how and why a federal entity is collecting personal information, what information is being collected, what burdens collection will impose, how that information may be used and shared, how it will be stored and secured, and for how long it will be retained. EPIC depends on this public information to inform its research, advocacy, public education, and member education concerning the systems and databases used throughout the government. EPIC further relies on this information to craft targeted Freedom of Information Act requests for agency records. EPIC's ability to perform these mission-critical functions is directly impaired by DHS's failure to publish the revised SORN or SORNs that the Privacy Act requires. To fill the gaps left by the missing SORN or SORNs, EPIC has undertaken work to research, analyze, and inform the public about how DHS is tracking protected First Amendment activities.

134.   EPIC has been harmed and will continue to be harmed by the lack of a revised SORN or SORNs, and by the denial of the opportunity to submit comment required by the Privacy Act. This vital information and opportunity for public comment would help EPIC fulfill its core mission of educating, advocating for, and protecting the public and its members with respect to issues affecting privacy rights.

135.   Because of DHS's failure to disclose information required by statute, EPIC must expend resources on more burdensome methods of research and information gathering, including time-intensive FOIA requests, and likely now litigation, to attempt to obtain timely access to relevant records, none of which is a substitute for the unique information Defendants have failed to create and publish as required by the Privacy Act.

- 40 -

COMPLAINT                                                                 Case No.

# VII.   CLAIMS FOR RELIEF

## COUNT I

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A)
#### (Agency Action Not In Accordance With Law—Maintaining Information Describing First Amendment Activities)
#### By All Plaintiffs Against All Defendants

136.   Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

137.   The Protester Surveillance Policy is final agency action. Final agency action (1) marks the consummation of the agency's decisionmaking process, and (2) either creates legal consequences or determines rights or obligations. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Agency action does not need to be formally promulgated, *see, e.g.*, *Her Majesty the Queen in Right of Ont. v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990), or reduced to a single edict, *see, e.g.*, *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48-49 (D.C. Cir. 2000), to qualify as final. By rescinding prior restrictions on protestor surveillance, and engaging in the widespread creation and maintenance of records describing the First Amendment exercise of observers and protesters since March or April 2025, DHS has changed its policy in a "consummation of the agency's decisionmaking process." DHS's Protester Surveillance Policy determines "rights or obligations" or creates "legal consequences," *Bennett*, 520 U.S. at 177-78 (citation omitted), because DHS's creation and maintenance of the records triggers rights, obligations, or legal consequences, including under the Privacy Act, for both DHS and its agents and the legal observers and protesters whose records are collected and maintained. Because DHS's Protester Surveillance Policy is "final agency action for which there is no other adequate remedy in a court," it is subject to judicial review under the APA. 5 U.S.C. § 704.

138.   The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

- 41 -

COMPLAINT                                                   Case No.

139.    The Privacy Act prohibits agencies from "maintain[ing]" any "record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized" by statute or the person about whom the record is maintained, or "unless pertinent to and within the scope of an authorized law enforcement activity[.]" 5 U.S.C. § 552a(e)(7).

140.    DHS collected personally identifying information on Individual Plaintiffs that describes their protest or legal observation activity and therefore describes how these individuals exercise their First Amendment rights. DHS collected and maintains these records because Individual Plaintiffs have exercised their First Amendment rights.

141.    The collection and maintenance of these records has not been authorized by statute or by the people about whom the records are maintained. Nor are the records "pertinent to" or "within the scope of an authorized law enforcement activity[.]" *Id.* DHS's actions therefore violate the Privacy Act and are "not in accordance with law," 5 U.S.C. § 706(2)(A).

## COUNT II

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
5 U.S.C. § 706(2)(A)
(Agency Action Not In Accordance With Law – Maintaining Information Not
Relevant and Necessary to Accomplish Required DHS Purpose)
*By All Plaintiffs Against All Defendants***

142.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

143.    The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

144.    DHS is unlawfully maintaining information that is not relevant or necessary to accomplish a required DHS purpose. The Privacy Act requires that agencies "shall" maintain "only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President[.]" 5 U.S.C. § 552a(e)(1).

- 42 -

COMPLAINT                                                    Case No.

145.   As a result of its Protester Surveillance Policy, DHS is maintaining records describing the First Amendment exercises of Individual Plaintiffs that are neither "relevant" nor "necessary" to accomplish any agency purpose required by statute or executive order. DHS collected these records for no reason other than that Individual Plaintiffs were observing or otherwise exercising their First Amendment rights. These records are not relevant or necessary to any required DHS purpose, and DHS's maintenance of the records violates § 552a(e)(1).

146.   DHS's actions therefore violate the Privacy Act and are "not in accordance with law," 5 U.S.C. § 706(2)(A).

## COUNT III

### VIOLATION OF APA, 5 U.S.C. § 706(2)(A)
**(Arbitrary and Capricious Agency Action – Rescission of Prior Policies)**
***By All Plaintiffs Against All Defendants***

147.   Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

148.   DHS's rescissions of the 2023 Facial Recognition Directive and 2016 Mobile Application Privacy Policy are final agency actions. 5 U.S.C. § 704. The rescission of an agency policy that affects "rights or obligations" or creates "legal consequences" qualifies as final agency action reviewable under the APA. *Bennett*, 520 U.S. at 178 (internal citation omitted); *see DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 9 (2020); *Biden v. Texas*, 597 U.S. 785, 808-09, 814 (2022). DHS's rescissions are neither "tentative" nor "interlocutory," they are formal changes in policy affecting DHS agents' interactions with the public and thus mark "the consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 177-78. The DHS rescissions redefine the scope of permissible DHS record creation and maintenance activity and thus determine rights and obligations, including under the Privacy Act. Because DHS's rescissions of these policies are each "final agency action for which there is no other adequate remedy in a court," they are subject to judicial review under the APA. 5 U.S.C. § 704.

- 43 -

149. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and "capricious." *Id.* § 706(2)(A).

150. Defendants have acted arbitrarily and capriciously in rescinding the 2023 Facial Recognition Directive and the 2016 Mobile Application Privacy Policy because, among other things, Defendants:

    a. Failed to acknowledge or explain, in any way, their departure from the agency policies, positions, and statutory interpretations articulated in the rescinded policies;

    b. Failed to engage in reasoned decisionmaking or reasonably explain any factual or legal basis for why rescission of the policies was justified;

    c. Failed to reasonably consider the privacy implications of the policies' rescission; and

    d. Failed to consider the reliance interests and reasonable privacy expectations of Individual Plaintiffs and other members of the public, who reasonably expected Defendants to protect their privacy interests consistent with existing law and DHS policy.

## COUNT IV

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
5 U.S.C. § 706(2)(D)
(Agency Action Contrary to Statutory Procedure – Failure to Issue
or Revise SORN and Solicit Public Feedback)
*By All Plaintiffs Against All Defendants***

151. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

152. The APA requires courts to "hold unlawful and set aside agency action" that is "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(D).

153. DHS's collection and maintenance of records pertaining to legal observers and protesters under the Protester Surveillance Policy is not authorized by the SORN that DHS has promulgated for ATS or any other DHS system of records.

- 44 -

154. By collecting and storing records pertaining to legal observers and protesters, in ATS or any other system of records, DHS has revised the "existence" or "character" of one or more DHS systems of records. When an agency revises the "character" of a system of records or creates a new one, the Privacy Act requires that agency to publish a notice in the Federal Register that describes "the categories of individuals on whom records are maintained[,]" "each routine use of the records[,]" and "the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records," among other things. 5 U.S.C. § 552a(e)(4). This is commonly referred to as a "system of records notice" (SORN). Though DHS revised the character or existence of one or more of its systems of records, DHS has not published any revised SORN as required by § 552a(e)(4).

155. In addition to publishing a revised SORN, the Privacy Act also requires DHS, at least 30 days in advance of that publication, to "publish in the Federal Register notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11).

156. DHS has not provided the public with the notice and opportunity to submit information required by the Privacy Act's § 552a(e)(11).

157. As a result, DHS has complied with neither § 552a(e)(4)'s system-of-records-notice requirement nor § 552a(e)(11)'s notice-and-opportunity-to-submit-information requirement. DHS's actions are therefore "without observance of procedure required by law" for two independent reasons. 5 U.S.C. § 706(2)(D).

## COUNT V

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
5 U.S.C. § 706(1)**
**(Agency Action Unlawfully Withheld or Unreasonably Delayed – Failure to Issue or Revise SORN and Solicit Public Feedback)**
*By All Plaintiffs Against All Defendants*

158. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

COMPLAINT                                                    Case No.

159. The APA requires courts to "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

160. As alleged above, DHS's collection and maintenance of records pertaining to protesters and legal observers on the basis of their First Amendment activities is not authorized by the SORN DHS has promulgated for ATS or any other DHS system of records. As a result, as alleged above, the Privacy Act's § 552a(e)(4) requires that DHS publish a revised SORN for any system in which DHS maintains records pertaining to protesters and legal observers on the basis of their First Amendment activities.

161. Nonetheless, DHS has not revised the relevant SORN or SORNs as required by § 552a(e)(4). DHS has also failed to provide the 30-day notice and opportunity for public submission required by § 552a(e)(11).

162. To the extent that maintaining records describing the First Amendment exercise of protesters and legal observers is allowable under the Privacy Act's §§ 552a(e)(1) and (e)(7), DHS has "unlawfully withheld or unreasonably delayed" agency action for two independent reasons. 5 U.S.C. § 706(1).

## COUNT VI

**VIOLATION OF APA, 5 U.S.C. § 706(2)(A)**
**(Arbitrary and Capricious Agency Action – Adoption**
**of Protester Surveillance Policy)**
***By All Plaintiffs Against All Defendants***

163. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

164. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A).

165. Defendants have acted arbitrarily and capriciously in undertaking a policy and practice of collecting and maintaining personally identifying information on Individual Plaintiffs notwithstanding §§ 552a(e)(1) and (e)(7), and without

COMPLAINT                                                                    Case No.

revising or issuing a new SORN mandated by § 552a(e)(4) or the pre-publication requirements of § 552a(e)(11) because, among other things, Defendants:

a. Failed to engage in reasoned decisionmaking or reasonably explain why they believe they are authorized to engage in the collection and maintenance of personally identifying information about legal observers' and protesters' First Amendment exercise under §§ 552a(e)(1) and (e)(7), or without issuing a new or revised SORN or undertaking the pre-publication requirements for a SORN under §§ 552a(e)(4) or (e)(11);

b. Failed to engage in reasoned decisionmaking by adopting their new policy and practice of collecting and maintaining personally identifying information on protesters without soliciting or considering public comment;

c. Failed to reasonably consider the reliance interests and reasonable privacy expectations of Individual Plaintiffs and other members of the public, who reasonably expected not to have their information collected by the federal government simply because they engaged in protected First Amendment exercise;

d. Failed to consider the privacy implications of their actions;

e. Failed to acknowledge or explain their departure from longstanding agency policies, positions, and statutory interpretations.

## COUNT VII

### VIOLATION OF NON-DISCRETIONARY OFFICIAL DUTIES, 28 U.S.C. § 1361
### (Mandamus)
### *By All Plaintiffs Against All Defendants*

166. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

- 47 -

COMPLAINT                                                    Case No.

167. "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

168. For the same reasons alleged in Counts I, II, IV, and V, DHS violated its non-discretionary duties under the Privacy Act to refrain from collecting and maintaining records in violation of §§ 552a(e)(1) and (e)(7), and to provide opportunity for public comment and publish a revised SORN or SORNs under §§ 552a (e)(4) and (e)(11).

169. Plaintiffs have a clear and indisputable right to relief from DHS's violation of its non-discretionary Privacy Act obligations.

## COUNT VIII

### VIOLATION OF THE FIRST AMENDMENT
#### (Retaliation for Protected Activity)
##### *By Individual Plaintiffs Against All Defendants*

170. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

171. The First Amendment to the United States Constitution protects the right to free speech, freedom of association, and to peaceably assemble. "This includes the right to record law enforcement officers engaged in the exercise of their official duties in public places." *Askins v. DHS*, 899 F.3d 1035, 1044 (9th Cir. 2018).

172. The government violates the First Amendment when it retaliates against someone for exercising their First Amendment rights. *See, e.g.*, *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018) ("[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech."). The First Amendment prohibits the government from retaliating against or punishing protected speech and activity when a plaintiff has "(1) engaged in a constitutionally protected activity, (2) the [government's] actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the [government's]

- 48 -

conduct." *Bello-Reyes v. Gaynor*, 985 F.3d 696, 700 (9th Cir. 2021) (internal citation omitted).

173.   Defendants' creation and maintenance of records describing Individual Plaintiffs' First Amendment exercise, as well as Defendants' termination of Individual Plaintiffs' Trusted Traveler status due to the existence of those records, violate the First Amendment's prohibition on retaliation for engaging in protected First Amendment activity. Those actions retaliate against Individual Plaintiffs for engaging in speech and activity that the government disfavors due to Individual Plaintiffs' perceived beliefs.

174.   Individual Plaintiffs engaged in First Amendment-protected speech and activity when each of them peacefully observed and recorded the actions of federal immigration enforcement agents taking place in public. To punish Individual Plaintiffs for their protected First Amendment activities, Defendants first created records describing their First Amendment exercise, including by stopping or detaining Individual Plaintiffs in order to force them to provide identifying information that Defendants then recorded. Next, within days of creating the records, Defendants punished Individual Plaintiffs further by using those records they created to revoke Individual Plaintiffs' Trusted Traveler status, depriving them of the benefits of that status. These actions would "chill a person of ordinary firmness from continuing to engage in the protected activity[,]" *id.* And Individual Plaintiffs' First Amendment exercise "was a substantial or motivating factor in the [government's] conduct," *id*.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A.    Vacate and set aside Defendants' policy to collect and maintain records containing personally identifying information of legal observers and protestors;

COMPLAINT                                                                Case No.

B.     Vacate and set aside Defendants' policy to create, maintain, or use a system of records that includes personally identifying information of legal observers and protestors;

C.     Vacate Defendants' rescissions of the 2023 Facial Recognition Directive and the 2016 Mobile Application Privacy Policy and restore those policies to operative status;

D.     Order Defendants to delete all personally identifying information collected on legal observers or protestors, including photographs, videos, driver's license information, and vehicle information under Defendants' control, including in any system of records and in any other device or repository in which records are maintained, including but not limited to computers, cell phones, tablets, or other technology capable of storing information;

E.     Declare illegal the collection, maintenance, and use of records containing personally identifying information of United States Citizen or Legal Permanent Resident legal observers or protesters where the records are collected, maintained, or used solely as a result of the legal observers' and protesters' lawful First Amendment exercise;

F.     Enjoin Defendants from using personally identifying information collected from persons engaged in First Amendment protected activity pursuant to the Protester Surveillance Policy for any purpose, including to rescind or deny membership in Global Entry, TSA Precheck, or any other government benefit;

G.     Declare that no existing SORN satisfies Defendants' obligation under the Privacy Act to publish a new or revised SORN before collecting, maintaining, or using personally identifying information of protestors exercising their rights guaranteed under the First Amendment;

H.     Declare that Defendants' collection and maintenance of records describing Nicole Cleland, Jacquelyn Ivey, and Anna Walker's First Amendment

COMPLAINT                                                                                                    Case No.

exercise, as well as the use of those records to revoke their Trusted Traveler status, was unconstitutional retaliation against Individual Plaintiffs;

I.    Require Defendants to reinstate Individual Plaintiffs' lost Trusted Traveler status;

J.    Award Plaintiffs their costs, reasonable attorneys fees, and other disbursements deemed appropriate; and

K.    Grant such other relief as the Court deems necessary, just, and proper.

Dated: July 24, 2026              HAGENS BERMAN SOBOL SHAPIRO LLP

/s/ Lucas E. Gilmore
Lucas E. Gilmore (CA Bar No. 250893)
lucasg@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Phone: 510-725-3000

DEMOCRACY FORWARD FOUNDATION
Andrea J. Matthews* (MA Bar No. 694538)
amatthews@democracyforward.org
Jennifer Fountain Connolly* (DC Bar No. 1019148)
jconnolly@democracyforward.org
Adnan Perwez* (DC Bar No. 27532)
aperwez@democracyforward.org
Bradley Girard* (DC Bar No. 1033743)
bgirard@democracyforward.org
Ross Snyder* (DC Bar No. 90037922)
rsnyder@democracyforward.org
Robin F. Thurston* (DC Bar No. 1531399)
rthurston@democracyforward.org
P.O. Box 34553
Washington, D.C. 20043
Phone: 202-448-9090
Fax: 202-921-4875

*Attorneys for Plaintiffs*

- 51 -

COMPLAINT                                                      Case No.