BRETT A. SHUMATE
Assistant Attorney General
JAMES POWERS
Chief Litigation Counsel
ROMIL DEVANG AMIN, NJ Bar # 105232014
Trial Attorney
U.S. DEPARTMENT OF JUSTICE
FEDERAL PROGRAMS BRANCH
1100 L Street, N.W.
Washington, DC 20530
(202) 802-3416
Romil.D.Amin@usdoj.gov
Attorneys for Defendants

**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF CALIFORNIA**

**ELECTRONIC PRIVACY INFORMATION CENTER**, *et al.*,

*Plaintiffs*,

v.

**MARKWAYNE MULLIN**, in his official capacity as Secretary of the Department of Homeland Security, *et al.*,

*Defendants*.

Case No. 3:26-cv-04232-ABJ-MSB

**DEFENDANTS' MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS


INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................2

I. DHS (including ICE) is authorized by Congress to enforce federal immigration laws and protect federal property. ............................................2

II. Plaintiffs, the alleged injuries, and their claims ............................................3

LEGAL STANDARD..........................................................................................6

ARGUMENT .......................................................................................................6

I. Plaintiffs Lack Article III Standing to Pursue Most of Their Claims .............6

A. The Individual Plaintiffs Largely Lack Standing.................................6

B. EPIC Lacks Organizational Standing...................................................9

II. Most of Plaintiffs' Counts Fail to State a Claim ..........................................13

A. Plaintiffs Cannot Enforce the Privacy Act Through the APA ...........13

B. Plaintiffs Largely Fail to Challenge Final Agency Action .................16

C. Plaintiffs Fail to State a Mandamus Claim ........................................19

CONCLUSION ...................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Am. First Legal Found. v. Greer*,
153 F.4th 1311 (D.C. Cir. 2025) .......... 11

*Ariz. All. for Retired Ams. v. Mayes*,
186 F.4th 622 (9th Cir. 2026) .......... 9

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 2

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) .......... 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 6

*Bennet v. Spear*,
520 U.S. 154 (1997) .......... 18

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) .......... 14

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .......... 13

*Cell Assocs., Inc. v. NIH*,
579 F.2d 1155 (9th Cir. 1978) .......... 14, 15

*Citizens for Resp. & Ethics in Washington v. Trump*,
438 F. Supp. 3d 54 (D.D.C. 2020) .......... 20

*City of L.A. v. Lyons*,
461 U.S. 95 (1983) .......... *passim*

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 7, 12

*Cunningham v. Neagle*,
135 U.S. 1 (1890) .......... 3

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017) ........ 11, 12

*FAA v. Cooper*,
566 U.S. 284 (2012) ........ 14

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 9, 10

*Friends of Animals v. Jewell*,
828 F.3d 989 (D.C. Cir. 2016) ........ 11

*Haase v. Sessions*,
835 F.2d 902 (D.C. Cir. 1987) ........ 9

*Kildare v. Saenz*,
325 F.3d 1078 (9th Cir. 2003) ........ 20

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........ 17, 19

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ........ 14

*Noem v. Vasquez Perdomo*,
146 S. Ct. 1 (2025) (mem.) ........ 8

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ........ 17, 18, 19

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ........ 8

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ........ 15

*Rizzo v. Goode*,
423 U.S. 362 (1976) ........ 9

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) ........ 11

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ........ 6, 12

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 11

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 6, 7

*U.S. Army Corp. of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 18

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) .......... 16

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) .......... 7

*Wild Fish Conservancy v. Jewell*,
730 F.3d 791 (9th Cir. 2013) .......... 18

**UNITED STATES CONSTITUTION**

U.S. Const. art. II, § 1, cl. 1 .......... 3

U.S. Const. art. II, § 3 .......... 3

**STATUTES**

5 U.S.C. § 551 .......... 17, 18, 19

5 U.S.C. § 552a .......... *passim*

5 U.S.C. § 553 .......... 15

5 U.S.C. § 701 .......... 13

5 U.S.C. § 702 .......... 14

5 U.S.C. § 704 .......... 13, 17

5 U.S.C. § 706 .......... 4

6 U.S.C. § 202 .......... 2

6 U.S.C. § 252 .......... 2

8 U.S.C. § 1103 .......... 2

8 U.S.C. § 1357 .......... 2

19 U.S.C. § 1589a ........................................ 2

**REGULATIONS**

Reissuance of OMB Circular No. A-108, "Federal Agency Responsibilities for Review, Reporting, and Publication Under the Privacy Act", 81 Fed. Reg. 94,424 (Dec. 23, 2016) ........................................ 16

**RULES**

Fed. R. Civ. P. 12 ........................................ 6

## INTRODUCTION

Federal officers across the nation routinely perform their statutory duties to enforce federal immigration laws by locating, arresting, and detaining individuals unlawfully present in the country, including many criminals who pose a recognized threat to public safety. During the course of their duties, officers have at times faced threats and hostile conduct. For example, people have surrounded ICE officers in the process of making an arrest or have driven very closely behind law enforcement vehicles and pursued them. Based on those particular circumstances, officers at times have undertaken steps to safely complete their operations. This includes occasionally stopping the vehicles following them and informing the drivers that they are interfering with federal law enforcement or causing safety hazards.

Plaintiffs' complaint attempts to stitch together an array of these kinds of alleged incidents into a series of Administrative Procedure Act ("APA") and constitutional claims. Plaintiffs seek sweeping judicial oversight of all federal immigration operations across the nation and the collection of data obtained on scene by federal officers during the course of their official duties. But Plaintiffs' claims fail at the threshold because they lack standing to pursue the prospective equitable relief they seek. Plaintiffs allege that Defendants have adopted a so-called Protester Surveillance Policy and that the three named Plaintiffs were retaliated against for exercising their First Amendment rights. But Plaintiffs' alleged past experiences with individual federal officers are far from sufficient to show that they face certainly impending injury from similar conduct in the future. Nor can their claims be supported by the purported Protester Surveillance Policy. Plaintiffs point to no official publication or other concrete indicia that such a policy exists. Their anecdotal experiences and mere say-so cannot transform a series of alleged encounters with law enforcement into a top-down official policy creating Article III injury. Indeed, at least two of the Plaintiffs allege that they continue to engage in protest and observation activity.

Most of Plaintiffs' Complaint also fails to plausibly state any claim. Plaintiffs allege numerous APA claims that are rooted in individual alleged law enforcement encounters, which are not themselves final agency action subject to APA review. And Plaintiffs fail to adequately allege that any Protester Surveillance Policy exists, much less that it constitutes a final agency action subject to judicial review. Plaintiffs also fail to show any violation of the APA through the alleged rescission of certain prior discretionary DHS policies. Nor can Plaintiffs plead Privacy Act claims under the guise of the APA. The APA forbids the use of its cause of action to circumvent a separate statutory scheme like the Privacy Act. Finally, Plaintiffs also fail to meet the surpassingly stringent standards to plead a mandamus claim.

The Court should grant the Defendants' Motion to Dismiss.

## BACKGROUND

### I. DHS (including ICE) is authorized by Congress to enforce federal immigration laws and protect federal property.

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Congress has established an "extensive and complex" framework for the "governance of immigration and alien status." *Id.* at 395. "A principal feature" of this congressionally established "removal system is the broad discretion exercised by immigration officials." *Id.* at 396.

DHS is empowered to "control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). Immigration and Customs Enforcement (ICE), an agency within DHS, is one of the many agencies charged with enforcing and administering federal immigration laws, preventing terrorism, and combating transnational criminal threats. *See*, *e.g.*, 6 U.S.C. §§ 202, 252(a)(3). ICE law enforcement personnel have the authority to make criminal and civil arrests. *See*, *e.g.*, 8 U.S.C. § 1357(a)(2), (4), (5); 19 U.S.C. § 1589a. Similar authority is also vested in officers from Homeland Security

Investigations; the Drug Enforcement Administration; the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the United States Marshals Service.

In addition, the Constitution grants the President the "executive Power," U.S. Const. art. II, § 1, cl. 1, and affords him both the authority and the responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. These provisions authorize the President to enforce federal statutes as well as to protect federal officials, federal property, and the performance of federal functions. *See Cunningham v. Neagle*, 135 U.S. 1, 64–68 (1890). While DHS has extensive authority, it has an explicit policy that instructs personnel not to "profile, target, or discriminate against any individual for exercising his or her First Amendment rights," and not to "collect, maintain in DHS systems, or use information protected by the First Amendment" unless an exception applies, such as when "that information is relevant to a criminal, civil, or administrative activity relating to a law DHS enforces or administers."[1]

In 2012, DHS published the most recent SORN revision (ATS SORN). In 2016, DHS issued the Mobile Application Privacy Policy (MAPP). In 2023, DHS issued the Facial Recognition Directive (FRD). DHS has since rescinded the MAPP and FRD. *See* Compl. ¶¶ 47, 60-66, ECF No. 1.

**II. Plaintiffs, the alleged injuries, and their claims**

This lawsuit arises principally out of the alleged interactions of three individual Plaintiffs (Jacquelyn Ivey, Nicole Cleland, and Anna Walker) with federal law enforcement officers from DHS, CBP, and ICE. Plaintiff organization, Electronic Privacy Information Center (EPIC) also brings claims as described below. Plaintiffs pursue eight claims against Defendants DHS, ICE, CBP, and their respective agency heads in their official capacity.

First, Plaintiffs allege that DHS collected personally identifying information

---

[1] Defs. MTD-Ex. A (DHS Memo re: Information Regarding First Amendment Protected Activities (May 17, 2019)).

on Individual Plaintiffs that described "their protest or legal observation activity" and how they exercised "their First Amendment rights." *See* Compl. ¶¶ 137-40. They further allege that this was final agency action. The individual Plaintiffs link this claim to particular alleged incidents where DHS officers interacted with Plaintiffs and allegedly limited their movement and recorded them. *See id.* ¶ 116.

Second, Plaintiffs contend that DHS is "unlawfully maintaining information that is not relevant or necessary to accomplish a required DHS purpose" in violation of the Privacy Act and 5 U.S.C. § 706(2)(A). *Id.* ¶¶ 144-46. Third, the Plaintiffs claim DHS's rescissions of the FRD and MAPP are final agency actions which "redefine the scope of permissible DHS record creation and maintenance activity" and are subject to judicial review under the APA. *Id.* ¶¶ 148-50. Fourth, Plaintiffs allege DHS's collection and maintenance of records pursuant to the alleged Protestor Surveillance Policy is contrary to the APA. They allege that the Defendants failed to comply with "§ 552a(e)(4)'s system-of-records-notice requirement" and "§ 552a(e)(11)'s notice-and-opportunity-to-submit-information requirement." *Id.* ¶ 157. Fifth, Plaintiffs claim that DHS failed to publish a revised SORN and failed to "provide the 30-day notice and opportunity for public submission required." *Id.* ¶ 161. Sixth, Plaintiffs contend that DHS acted arbitrarily and capriciously in adopting the purported Protester Surveillance Policy "notwithstanding §§ 552a(e)(1) and (e)(7), and without revising or issuing a new SORN mandated by § 552a(e)(4) or the pre-publication requirements of § 552a(e)(11)." *Id.* ¶ 165. Seventh, Plaintiffs allege DHS violated its duties under the Privacy Act to refrain from collecting and maintaining records "[f]or the same reasons alleged in Counts I, II, IV, and V." *Id.* ¶ 168. Lastly, the individual Plaintiffs claim that DHS retaliated against them for engaging in protected First Amendment activity.

Plaintiffs assert four principal theories of injury to support their claims against the Defendants. First, Plaintiffs allege that the individual Plaintiffs were harmed because DHS rescinded FRD and MAPP and the collection and maintenance of the

records describing their interaction with federal officers facilitated the revocation of their TTP status. *See id.* ¶ 137. Second, the Plaintiffs allege that the collection and maintenance of the individual Plaintiffs' records "exerts a chilling effect on Individual Plaintiffs' speech and causes them emotional distress." *Id.* ¶ 115. Third, Plaintiffs allege that "DHS's decision to revoke the Individual Plaintiffs' Trusted Traveler status caused further injury by punishing them for their perceived political expression." *Id.* ¶ 122. Fourth, Plaintiff Cleland alleges that she continues to experience ongoing injury because her Trusted Traveler Status has not been reinstated. Plaintiffs Walker and Ivey have each had their status reinstated. *Id.* ¶¶ 95-102, 105-11. Lastly, EPIC alleges that it was injured by the "lack of Privacy-Act-mandated transparency" and "DHS's failure to publish a revised SORN." *Id.* ¶¶ 129, 133.

Based on these claims against the Defendants and theories of injury, Plaintiffs seek remedies including: (1) vacating and setting aside Defendants' alleged policy to collect and maintain records containing personally identifying information; (2) vacating and setting aside Defendants' alleged policy to create, maintain, or use a system of records; (3) vacating the recissions of MAP and FRD; (4) ordering Defendants to delete all personally identifying information collected on legal observers or protestors; (5) declaring illegal the alleged collection, maintenance, and use of records containing personally identifying information which were collected, maintained, or used solely as a result of the legal observers' and protesters' lawful First Amendment exercise; (6) enjoining Defendants from using personally identifying information pursuant to the purported Protester Surveillance Policy for any purpose; (7) declaring that that no existing SORN satisfies Defendants' obligation under the Privacy Act to publish a new or revised SORN before collecting, maintaining, or using personally identifying information of protestors exercising their rights guaranteed under the First Amendment; (8) declaring that the revocation of Trusted Traveler statuses for Plaintiffs Cleland, Ivey, and Walker was

unconstitutional retaliation; and (9) requiring Defendants to reinstate Plaintiffs' lost Trusted Traveler status. Compl., Prayer for Relief.

## LEGAL STANDARD

Defendants bring this motion under Rule 12(b)(1), arguing lack of standing and under 12(b)(6), arguing that Plaintiffs have failed to state a claim.

Subject matter jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(1). Where a party seeks prospective equitable relief, they must make "allegations of future injury [that are] particular and concrete." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998). Prospective equitable relief requires a threatened injury that is "concrete" and "'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of L.A. v. Lyons*, 461 U.S. 95, 101-02 (1983); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021).

Under Rule 12(b)(6), courts must dismiss complaints that do not allege sufficient facts to demonstrate a plausible entitlement to relief. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility showing "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation[,]" and it "asks for more than a sheer possibility that [the] defendant has acted unlawfully." *Id.*

## ARGUMENT

Plaintiffs lack standing to pursue most of their claims because they are based on alleged past events that do not establish any continuing risk of future injury to Plaintiffs. Alternatively, almost all of Plaintiffs' claims fail as a matter of law.

### I. Plaintiffs Lack Article III Standing to Pursue Most of Their Claims

#### A. The Individual Plaintiffs Largely Lack Standing.

To begin, the individual Plaintiffs largely lack standing to seek prospective

relief based on allegations of encounters with individual federal officers in the past.[2]

While allegations of past injury might support a remedy at law, prospective equitable relief requires a claim of imminent future harm. *Lyons*, 461 U.S. at 105; *see also TransUnion LLC*, 594 U.S. at 435. "Allegations of *possible* future injury do not satisfy the requirements of Art. III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added). To constitute injury in fact, a threatened injury must be "certainly impending." *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). And to obtain prospective relief, a plaintiff must allege "a sufficient likelihood" such that the specific plaintiff will "again be wronged in a similar way[.]" *Lyons*, 461 U.S. at 111. A plaintiff may not rely "on mere conjecture about possible governmental actions" to demonstrate injury, and must instead present "concrete evidence to substantiate their fears." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013).

The facts and reasoning of *Lyons* are instructive here. *Lyons* was a civil rights action against the City of Los Angeles and several police officers who had allegedly stopped the plaintiff for a routine traffic violation and applied a chokehold without provocation. In addition to seeking damages, the plaintiff sought an injunction against future use of the chokehold unless deadly force was threatened. The Supreme Court held that the plaintiff lacked standing to seek prospective relief because he could not show a real or immediate threat of future harm:

> That Lyons may have been illegally choked by the police . . ., while presumably affording Lyons standing to claim damages . . . does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part.

---

[2] This motion does not dispute (1) the individual Plaintiffs' standing to seek Privacy Act relief as to records concerning them that are allegedly maintained by Defendants and (2) Defendant Cleland's standing for her narrow claim regarding the revocation of her Trusted Traveler Status. Those claims should be dismissed, however, for failure to state a claim. *See infra*. Defendants reserve the right to later challenge the Court's jurisdiction as to these claims and theories of injury.

*Lyons*, 461 U.S. at 105; *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). *Lyons* concluded that to demonstrate a real and immediate threat of injury, the plaintiff would have to show either a consistent practice, always followed by all officers, that violated his rights, or an official policy prescribing that practice. *See* 461 U.S. at 106 (requiring that he show "(1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, . . . or, (2) that the City ordered or authorized police officers to act in such manner"); *see also Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (mem.) (Kavanaugh, J., concurring in grant of stay) ("[P]laintiffs have no good basis to believe that law enforcement will unlawfully stop *them* in the future based on the prohibited factors—and certainly no good basis for believing that any stop of the plaintiffs is imminent. Therefore, they lack Article III standing[.]").

*Lyons* and its progeny foreclose the individual Plaintiffs' standing to obtain equitable relief. While Plaintiffs allege that they will continue to engage in protest and observation activity, the injuries they claim arise from spontaneous encounters with individual federal law enforcement while they are actively engaged in law enforcement activity. Plaintiffs fail to sufficiently allege that *they* will face the same kind of conduct alleged in the Complaint again. For example, Plaintiffs Ivey and Walker allege that they "continue[s] to engage" in "legal observation activities," Compl. ¶¶ 103, 112, but do not allege that the Government conduct they complain of has happened each and every time, or even consistently. *See Lyons*, 461 U.S. at 106 (requiring plaintiff to show "that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter").

Nor have Plaintiffs sufficiently alleged the existence of any Government policy, whether written or *de facto*, prescribing the allegedly unlawful conduct at issue. Article III requires "more than a nebulous assertion of the existence of a

policy"—the plaintiff must "not only demonstrate its existence but also that [he is] likely to be subjected to the policy again." *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987). Plaintiffs cite nothing at all to substantiate the existence of the so-called Protestor Surveillance Policy. And it is not enough to say, as *Lyons* makes clear, that allegedly improper conduct occurs "routinely," or that "the 'odds'" are high that plaintiffs' constitutional rights will be violated again. 461 U.S. at 105–06, 108 (citation omitted); *see also Rizzo v. Goode*, 423 U.S. 362, 373 (1976) (denying injunctive relief based on twenty constitutional violations "occurring at large in a city of three million inhabitants"). In sum, the individual Plaintiffs lack standing to obtain the sweeping prospective relief they seek regarding Defendants' immigration and law enforcement activities.

**B. EPIC Lacks Organizational Standing**

Organizations may "sue on their own behalf for injuries they have sustained[,]" but, like all litigants, they must "satisfy the usual standards for injury in fact, causation, and redressability." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024) (citation omitted). Specifically, EPIC alleges that "organizational injury," Compl. ¶ 129, based on an alleged diversion of organizational resources and based on Defendants' alleged failure to offer an opportunity to submit comments in response to agency actions that EPIC argues was legally required. *Id.* ¶¶ 131-34. But none of these allegations establish organizational standing.

First, as discussed above, Plaintiffs fail to plausibly allege the existence of any Protestor Surveillance Policy. Thus, any organizational expenditures premised on the possible impacts of such a policy on EPIC are self-inflicted and not fairly traceable to the challenged conduct of the Defendants. *See Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 634 (9th Cir. 2026) (en banc) (holding that potential expenditures to mitigate the hypothetical impact of a challenged action "cannot support standing" when the alleged impact "lacks record support and is highly

speculative." (quoting *All. for Hippocratic Med.*, 602 U.S. at 390)). EPIC cannot generate its own Article III injury by speculating that a policy exists and acting of its own accord to challenge that policy.

Nor can EPIC allege standing on this basis even if the Protestor Surveillance Policy *were* plausibly alleged. *Alliance for Hippocratic Medicine* shows why. There, four associations challenged actions by the Food and Drug Administration (FDA) relaxing "regulatory requirements for mifepristone, an abortion drug." *All. for Hippocratic Med.*, 602 U.S. at 372–73, 376. Although the associations neither prescribed nor used mifepristone themselves, they asserted that they had standing to challenge FDA's actions because those actions "impaired" the associations' "ability to provide services and achieve their organizational missions." *Id.* at 394 (citation omitted). Thus, the associations asserted that their injuries went beyond "mere disagreement with FDA's policies" because they had "incurr[ed] costs to oppose FDA's actions." *Id.* For example, the associations had "conduct[ed] their own studies on mifepristone so that" they could "better inform their members and the public about mifepristone's risks." *Id.* And they had "expend[ed] considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id.* (citation omitted). Those activities, the associations asserted, had required them to expend "considerable resources to the detriment of other spending priorities." *Id.* (citation omitted).

But the Supreme Court unanimously held that associations "cannot spend [their] way into standing[.]" *Id.* The generic setback to associations' missions without any actual "impediment to [their] advocacy businesses" does not support Article III standing. *Id.* at 395. To hold otherwise would allow virtually every organization to "manufacture its own standing" by "spend[ing] a single dollar" to counteract any governmental policy it wishes to challenge. *Id.* at 394–95. So too here. Further, the additional activities EPIC alleges that it has been forced to undergo are activities that are entirely consistent with the mission of the

organization, and consistent with activities it already undertakes.

Nor can EPIC show standing based on the allegation that the Defendants violated their purported right to participate in notice-and-comment proceedings. *See* Compl. ¶ 132. "[T]he 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient' to confer Article III standing." *Am. First Legal Found. v. Greer*, 153 F.4th 1311, 1314 (D.C. Cir. 2025) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). In other words, even when a plaintiff alleges a violation of some procedural right, the plaintiff still must show a link between the asserted procedural deprivation and a concrete injury. EPIC alleges no such concrete harm. The only other harm they allege—diversion of organizational resources—is not cognizable for the reasons discussed above.

Plaintiffs' invocation of "informational" injuries in connection to allegations of procedural harm (such as SORNs and notice and comment) is just a repackaging of those allegations and fails for the same reasons. And to the extent Plaintiffs try to rely on an independent theory of informational standing, that effort fails, because the relevant provisions of the Privacy Act do not create any "informational" rights for organizations. *See* 5 U.S.C. § 552a(g)(1), (a)(2) (authorizing civil actions only by an "individual," defined as a citizen or lawful permanent resident). To carry its burden of demonstrating a "sufficiently concrete and particularized informational injury," the plaintiff must show that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)); *see also Spokeo, Inc. v. Robins,* 578 U.S. 330, 340 (2016) ("judgment of Congress" is "important" to "whether an intangible harm," including informational harm, "constitutes injury in fact"). *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir.

2017).

The individual Plaintiffs also allege that they "reasonably fear the government has entered them onto a list of purported 'domestic terrorists'"; "felt fear and concern that she has exposed her friends to government retaliation through guilt by association with her, and has become particularly anxious"; "self-censored some of her personal communications over electronic media for fear of government surveillance"; and "experiences fear and anxiety each time she travels. *See* Compl. ¶¶ 117–18. Essentially, they claim to be worried that, due to their interactions with DHS, they face some marginally increased risk that their data may be on a list and be shared or misused by some as-yet-unidentified bad actors.

This sort of speculation and anxiety is not enough to support standing. In general, "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co.*, 523 U.S. at 107. Instead, "[i]t is the *reality* of the threat of [future] injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *Lyons*, 461 U.S. at 107 n.8. The "emotional consequences" of government action "simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Id.*

The Supreme Court rejected a similar theory of standing in *Clapper*. There, the Second Circuit had "allowed respondents to establish standing by asserting that they suffer present costs and burdens that are based on a fear of surveillance, so long as that fear is not fanciful, paranoid, or otherwise unreasonable." *Clapper*, 568 U.S. at 416 (citation modified). The Supreme Court reversed, explaining that the Second Circuit's approach "improperly waters down the fundamental requirements of Article III." *Id.* Those plaintiffs could not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id. Clapper* is fatal to Plaintiffs' standing here.

Finally, Plaintiffs Walker and Ivey lack standing to challenge the revocation

of their Trusted Traveler Status because it was restored before the commencement of this lawsuit. *See* Compl. ¶¶ 95-102, 105-11. No "injury-in-fact" exists for them and there is no imminent harm that they can successfully allege. Furthermore, their claims have already been redressed by the restoration of their Trusted Traveler Status. Plaintiff Ivey and Walker's concerns that their identity is "now on a list of Americans the federal government deems to be a threat" are highly speculative and do not support any allegation of certainly impending future injury to support Article III jurisdiction. *Id.* ¶¶ 103, 112.

## II. Most of Plaintiffs' Counts Fail to State a Claim

### A. Plaintiffs Cannot Enforce the Privacy Act Through the APA

Many of Plaintiffs' APA claims (Counts I, II, III, IV, V, and VI) rely on Privacy Act provisions in arguing that Defendants have acted unlawfully. These claims fail because Plaintiffs may not circumvent the Privacy Act's detailed remedial scheme by invoking the APA's general cause of action. *See* 5 U.S.C. § 552a(g). That scheme authorizes a carefully limited set of remedies. For two categories of violations—an agency's refusal to amend a record or to provide access to a record—Congress authorized prospective relief. *See id.* § 552a(g)(2)–(3). For other violations, Congress authorized damages upon a showing that the agency acted intentionally or willfully and that the plaintiff sustained the requisite injury. *See id.* § 552a(g)(1)(C)–(D), (g)(4).

Plaintiffs do not plead any Privacy Act cause of action in their Complaint but, rather, invoke the APA. But the APA only grants a cause of action where there is "no other adequate remedy in a court." 5 U.S.C. § 704. This statutory provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Along these lines, the APA also withholds review where other "statutes preclude judicial review," 5 U.S.C. § 701(a)(1), and its waiver of sovereign immunity does not apply where "any other

statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *id.* § 702.

This is true even where a statutory review scheme only provides for review of issues by certain parties. That simply shows that other parties are presumptively precluded from obtaining review of those issues under the APA. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded.").

Under these principles, none of the Plaintiffs may challenge purported violations of the Privacy Act under the APA, because the Privacy Act already provides an adequate alternative remedy for persons entitled to sue under that statute. The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information, *FAA v. Cooper*, 566 U.S. 284, 287 (2012), and authorizes adversely affected individuals to bring suit for violations of those requirements, *see* 5 U.S.C. § 552a(g)(1)(D). Civil remedies are available under the Act—and thus the United States' sovereign immunity has been waived—in certain carefully described circumstances. Plaintiffs cannot use the APA "to evade limitations on suit contained in" the Privacy Act. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).

This result is especially sensible with respect to the Privacy Act, because Congress "link[ed] particular violations of the Act to particular remedies in a specific and detailed manner[,]" which "points to a conclusion that Congress did not intend to authorize the issuance of [other] injunctions." *Cell Assocs., Inc. v. NIH*, 579 F.2d 1155, 1158-59 (9th Cir. 1978). Indeed, were injunctive relief freely available for violations of the Privacy Act generally—such as through the sort of generic APA claims that Plaintiffs bring here—"the detailed remedial scheme adopted by

Congress would make little sense." *Id.* at 1160. It is "unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board." *Id.*

EPIC's attempt to invoke the Privacy Act fails for an additional reason—the statute applies only to individuals, not corporate or organizational entities. *Id.* (authorizing a cause of action for adversely affected "individuals"); *id.* § 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence."). Because EPIC is not an "individual[]," *id.*, it is straightforwardly ineligible for any relief under the Privacy Act, and all its claims predicated on violations of the Privacy Act should be dismissed on that basis alone.

This case is a powerful illustration of the importance of these principles. In trying to force a Privacy Act peg into an APA hole, Plaintiffs' claim seems to impose procedural obligations on Defendants not present in the Privacy Act at all. For example, the APA contains an explicit requirement that, "[a]fter consideration of the relevant matter presented" during the comment period, "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). That statutory provision is why courts have long held that, as part of an APA rulemaking, the agency "must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing 5 U.S.C. § 553(c)). And that is why agencies publish a document titled a "Final Rule," in which they engage (often at great length) with commenters, explaining their reasoning.

But the Privacy Act's notice-and-comment provisions contain no comparable requirement—they require only notice of the proposed SORN modification and a 30-day comment period. *See* 5 U.S.C. § 552a(e)(4), (e)(11) (requiring "notice" and "an opportunity for interested persons to submit written data, views, or arguments to the agency"). That is why, unsurprisingly, agencies typically do not provide such

an explanation. But now, Plaintiffs ask this Court to hold that the agency's non-existent and not-required explanation was insufficient. *See* Compl. ¶ 165(a) (arguing that Defendants "Failed to engage in reasoned decisionmaking or reasonably explain"); *id.* (d) (arguing that Defendants "failed to consider").

If Plaintiffs are correct that every agency faces an implied APA-like obligation to respond to all significant comments received under the Privacy Act, then virtually *every* SORN publication (and OMB guidance since 1975, *see* Reissuance of OMB Circular No. A-108, "Federal Agency Responsibilities for Review, Reporting, and Publication Under the Privacy Act", 81 Fed. Reg. 94,424 (Dec. 23, 2016)) is unlawful under the APA—counsel's understanding is that agencies typically do not provide such an explanation, because there is no legal obligation to do so. Plaintiffs have certainly cited no case (and no example) to the contrary. And analogous case law under the APA itself confirms that federal courts are not permitted to innovate atextual procedural requirements that Congress declined to impose. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) (Section 553 "established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures").

The same issue exists as to Plaintiff's claim regarding rescission of the MAPP and FRD. Plaintiffs' claims here relate back to the purported impact of these rescissions on the agency's compliance with the Privacy Act and the relationship of these policies to the relevant SORNs. Accordingly, the Court should reject Plaintiffs' efforts to make an end run around the restrictions that Congress enacted in the Privacy Act through its invocation of the APA.

**B. Plaintiffs Largely Fail to Challenge Final Agency Action**

Most of Plaintiffs' APA claims fail under Rule 12(b)(6) because Plaintiffs do not challenge discrete and final agency action. Plaintiffs' claims challenge an array of alleged incidents by federal officers (*e.g.* being added to a database of "domestic

terrorists", facial-recognition scans, "being driven home by ICE") including three alleged instances where individual protestors were confronted by federal officers during unconventional protest activities. Compl. ¶ 5. Plaintiffs do not meaningfully address how most of the issues alleged in their Complaint constitute agency action at all under the APA. Instead, they challenge these various actions as a collective violation of the ATS SORN and the First Amendment. Plaintiffs' APA claims largely fail at the threshold because they have not identified a final agency action subject to judicial review.

For an "agency action" to be reviewable under the APA, it must be one of the "circumscribed, discrete" actions identified in the statutory definition of that term, *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004)—*i.e.*, "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13); *see also id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief"). A plaintiff seeking judicial review under the APA must therefore challenge a "specific" agency action falling within one of these discrete categories, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990), which "precludes" courts from considering "broad programmatic attack[s]" on agency operations, *SUWA*, 542 U.S. at 64. In that way, the APA constrains courts to their constitutionally limited role, permitting them to review discrete, concrete acts but precluding them from reviewing "sweeping actions" that seek "systemic" or "programmatic improvements" of agency operations or "wholesale correction" of agency conduct. *Lujan*, 497 U.S. at 891, 893, 894, 899. Here, the Plaintiffs allege that there is a systematic adoption of a Protester Surveillance Policy and are seeking "wholesale correction" of agency conduct based on alleged actions of a few individual federal officers.

Additionally, judicial review under the APA is available only to challenge an agency action that is "final." 5 U.S.C. § 704. Agency action is final if two conditions are satisfied. "First, the action must mark the consummation of the agency's

decisionmaking process—it must not be of a merely tentative or interlocutory nature." *U.S. Army Corp. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennet v. Spear*, 520 U.S. 154, 177–78 (1997)). "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett*, 520 U.S. at 178).

The Ninth Circuit addressed a similar issue in *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800–01 (9th Cir. 2013). The plaintiffs in *Wild Fish Conservancy*, challenged actions of the Fish and Wildlife Service and others, alleging violations of the APA and Reclamation Act by alleging that the Federal Defendants "operate dams 2 and 5 in a manner that obstructs fish passage through Icicle Creek during some or all of the year." *Id.* at 801 (citation omitted). Specifically, by closing the gates at structure 2, a mile long segment of the waterway was sometimes dewatered which led to an inadequate supply of water to existing fishways. In addressing an argument pertaining to the use of fishways, the panel found that the Conservancy's claim could not proceed under the APA because the suit did not target final agency action. It provided two reasons:

> First, it does not identify a discrete "agency action" that fits within the APA's definition of that term. 5 U.S.C. § 551(13); [*SUWA*], 542 U.S. at 62–63, . . . . While the Conservancy correctly argues that the act of closing the gates at structure 2 has immediate physical consequences, such action is not fairly analogous to a "rule, order, license, sanction, [or] relief." 5 U.S.C. § 551(13).
>
> The second reason that the Conservancy's claims do not implicate a final agency action is that the individual acts of closing the gates at structure 2 do not "mark the consummation of the agency's decisionmaking process," *Bennett,* 520 U.S. at 177–78, . . ., because they constitute day-to-day operations that merely implement operational plans for the Hatchery.

*Wild Fish Conservancy*, 730 F.3d at 801–02.

Like *Wild Fish Conservancy*, Plaintiffs have attached their own label to the alleged conduct of certain individual federal officers. These actions are nothing like the "circumscribed, discrete" actions identified in the statutory definition of "agency action" in the APA, *SUWA,* 542 U.S. at 62—*i.e.*, "the whole or a part of an agency

rule, order, license, sanction, relief, or the equivalent or denial thereof[.]" 5 U.S.C. § 551(13); *see also id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief").

The Supreme Court's decision in *Lujan* similarly forecloses Plaintiffs' attempt to dress up these alleged incidents as a Protestor Surveillance Policy subject to APA review. In *Lujan*, the National Wildlife Federation brought a challenge to what it called the Bureau of Land Management's "land withdrawal review program." 497 U.S. at 875. That "program" consisted of the "continuing (and thus constantly changing) operations of the BLM" in certain matters under the Federal Land Policy and Management Act of 1976. *Id.* at 877, 890. The Supreme Court held that the "so-called 'land withdrawal review program'" was "not an 'agency action' within the meaning of § 702" because it did "not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations." *Id.* at 890. These kinds of one-off day-to-day activities of individual agency employees bear no resemblance to agency action as defined by the APA, *i.e.* an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

Plaintiffs' claims suffer from the same flaw; the APA does not permit such a claim for wholesale judicial supervision. As in *Lujan*, Plaintiffs' claims regarding three particularized incidents do not challenge a discrete "agency action" subject to review under the APA. Instead of challenging discrete action, Plaintiffs' claims largely pursue a broad programmatic challenge to the conduct of federal officers across the country. Plaintiffs cannot aggregate "many individual actions" by federal officers into one claim so they may be challenged all at once. *See Lujan*, 497 U.S. at 892–93. Nor can a plaintiff cannot seek "wholesale improvement" of a federal agency's operations "by court decree." *Id.* at 891.

### C. Plaintiffs Fail to State a Mandamus Claim

Plaintiffs also fail to state a claim for mandamus. "Mandamus is an

extraordinary remedy and is available to compel a federal official to perform a duty only if: (1) the individual's claim is clear and certain; (2) the official's duty is nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt[;] and (3) no other adequate remedy is available." *Kildare v. Saenz*, 325 F.3d 1078, 1084 (9th Cir. 2003). Plaintiffs base their mandamus claim entirely on purported duties imposed on the Defendants by the Privacy Act. But Plaintiffs have not pleaded the kind of "ministerial" and "nondiscretionary" duties that could support a mandamus claim. Plaintiffs' claims largely pursue a broad programmatic challenge to the conduct of federal officers across the country and not to a particular official's duty. And whether the maintenance of certain records is "pertinent to and within the scope of an authorized law enforcement activity," 5 U.S.C. § 552a(e)(7), is plainly a matter that requires the "application of judgment" *Citizens for Resp. & Ethics in Washington v. Trump*, 438 F. Supp. 3d 54, 68 (D.D.C. 2020). The same is true as to questions about whether a particular collection of records is or is not authorized by a prior SORN. These are not the sort of unmistakable, judgment-free duties that can support mandamus.

## CONCLUSION

For the reasons stated, the Court should dismiss this case.

Dated: November 6, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JAMES POWERS
Chief Litigation Counsel
Federal Programs Branch

*/s/ Romil Devang Amin*
Romil Devang Amin
Trial Attorney
Federal Programs Branch

*Counsel for Defendants*